William I. WALSH, on his own behalf and on behalf of all those similarly situated, Plaintiff,

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., et al., Defendants.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., a corporation organized under the laws of the State of Maryland, Harold J. Berry, Walter D. Dance, Christopher F. Edley, Barbara Barnes Hauptfuhrer, Sidney A. Kohl, Paul C. Nagel, Jr., Eckart C. Siess, Fritz Teelen, Henry W. VanBaalen, and James Wood, individually and as members of the Board of Directors of the Great Atlantic & Pacific Tea Company, Inc., and Philip E. Hoversten, Robert G. Ulrich and H. Nelson Lewis, individually and as present or former members of the Retirement Board of the Employees' Retirement Plan of the Great Atlantic & Pacific Tea Company, Inc., and Participating United States Subsidiaries, Counterclaimants,

v.

William I. WALSH, on his own behalf and on behalf of all those similarly situated, Counterdefendant.

Civ. No. 81–3377.

United States District Court, D. New Jersey.

Feb. 9, 1983.

William I. Walsh, pro se and Kalb, Friedman & Siegelbaum by Marc S. Friedman, Roseland, N.J., Shea & Gould by Milton S. Gould, New York City, for plaintiff.

Connell, Foley & Geiser by Richard D. Catenacci, Newark, N.J., Cahill, Gordon & Reindel by Denis McInerney, Henry G. Bisgaier, R. Anthony Zeiger, and Robert G. Ulrich, Gen. Counsel, New York City, for defendants.

## OPINION

LACEY, District Judge.

■ Before this court, for judicial approval under Fed.R.Civ.P. 23(e), is a proposed class action compromise settlement. After careful consideration of the terms proposed, the merits of the claims asserted, and the several unique features of the controversy in suit, this court concludes that the settlement is fair, reasonable and adequate, and should be approved.

### Introduction

By the end of 1981, the funds in the Great Atlantic & Pacific Tea Company, Inc. (A & P) pension plan had expanded to an amount approximately $250,000,000 in excess of that required to fund its pension obligations. See Affidavit of James W. Rowe at ¶ 13; Additional Affidavit of Lawrence T. Brennan at ¶ 10; Exhibit III to Additional Brennan Affidavit. A & P decided to take this excess amount into the company treasury. Learning of this, William I. Walsh (hereinafter referred to as "Walsh" or "plaintiff"), a former A & P executive vice president (10/31/81 Walsh Aff. at ¶ 5), retained the well recognized and highly regarded New York law firm of Shea & Gould. Thereafter, a complaint was filed on Walsh's behalf and on behalf of all those similarly situated, seeking to prevent A & P from pursuing its program.

After joinder of issue, the action was determined to be maintainable as a class action. Fed.R.Civ.P. 23(c)(1). Then, following discovery, counsel for the class and for the defendants advised the court they had arrived at a settlement but that Walsh was not satisfied with its terms.

Subsequently, the settlement was submitted to the class at a hearing on September 21, 1982, followed by submissions by Walsh and counsel.

A detailed recital of the foregoing proceedings and events follows.

### The Pleadings

The Amended and Supplemental Complaint[1] alleges that, from the inception of the A & P Pension Plan (plan) in 1944,[2] A & P has assured its employees that the plan fund would be used exclusively for their benefit and that, upon the termination of

---

1. References hereinafter to "plaintiff" will be to Mr. Walsh as named plaintiff herein. Named as defendants were: The Great Atlantic & Pacific Tea Company, Inc. (A & P); the Employees' Retirement Plan of the Great Atlantic & Pacific Tea Company, Inc. and Participating United States Subsidiaries (Pension Plan); Bankers Trust Company (Pension Plan trustee); Rosemarie Baumeister, Harold J. Berry, Walter D. Dance, Christopher F. Edley, Helga Haub, Barbara Barnes Hauptfuhrer, Sidney A. Kohl, Paul C. Nagel, Jr., Eckart C. Siess, Fritz Teelen, Henry W. VanBaalen and James Wood (individually and as members of the Board of Directors of A & P); Philip E. Hoversten, Robert G. Ulrich and H. Nelson Lewis (individually and as members of the Retirement Board of A & P); Erivan Haub; Tengelmann Warenhandelsgesellschaft (a West German partnership); and Ernst Bodarwe.

2. It is not disputed that the A & P pension plan has qualified for treatment under Section 401(a) of the Internal Revenue Code (Code), 26 U.S.C. § 401(a), and that the Trust of the Retirement Plan is exempt from taxation under Section 501(a) of the Code, 26 U.S.C. § 501(a).

the plan, the plan's assets would be distributed to the plan members or their beneficiaries.[3] (Complaint ¶ 17) [4]

The complaint also alleges that, after a majority of A & P's outstanding stock was acquired by the Tengelmann partnership, a "scheme" was conceived by the defendants to divert assets from the plan fund to repair the sagging fortunes of A & P. (Complaint ¶¶ 20–26) [5] This "scheme" allegedly consisted of A & P's Board of Directors adopting a resolution on June 16, 1981, amending the pension plan to eliminate the requirement that, upon termination of the plan, the excess assets be distributed to plan members. (Complaint ¶ 28) Allegedly in furtherance of said scheme, on October 16, 1981, A & P stated that it intended to terminate the plan as of the end of 1981 and would offer a new form of plan to its employees, only to announce, after this lawsuit was initiated, that such action would be deferred pending resolution of this lawsuit. (Complaint ¶ 30)

The complaint claims a breach of fiduciary duty by defendants in violation of Sections 404 and 405 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1104, 1105; breach of contract; plaintiff's detrimental reliance on A & P's representations as to the distribution of excess assets; and wrongful seizure of the excess assets. (Complaint ¶¶ 34–43)

The complaint seeks (i) a declaratory judgment declaring unlawful defendants' amendment of the plan; (ii) preliminary and permanent injunctive relief restraining defendants from implementing amendment of the plan and from distributing to A & P the excess assets of the plan; and (iii) a mandatory injunction directing the granting of improved benefits to plan participants, the termination of the plan, the funding of benefits of plan participants, and the distribution of excess assets to the plan participants or, in the alternative, the utilization of those assets not required to provide plan benefits, for the increase of such benefits. (Complaint ¶ 1) The relief requested also includes a declaration that A & P's conduct has terminated the plan or, if it is determined that the plan has not been terminated, an order directing defendants to terminate the plan and to distribute the excess assets to plan participants. In the event termination is not ordered, plaintiff requests that A & P be required to increase existing plan benefits. (Complaint ¶ 4)

Defendants' answer and counterclaim admits that A & P amended the plan in June

---

3. Plaintiff cites the following provision from the 1960 summary booklet describing the plan in support of the allegations that A & P represented that the plan funds would be used exclusively for members' benefit.

PLAN CONTINUANCE

The Company hopes and expects to continue the Plan indefinitely, but reserves the right to amend or discontinue it at any time. Of course, anything you can do to help keep our business successful will help assure the Plan's continuance. However, if the Plan should end, all Plan funds must be used for the benefit of members and their beneficiaries.

(Complaint ¶ 17).

Central to plaintiff's allegations is the following language from section 11.4 of the plan as amended and restated (erroneously, according to A & P), on January 7, 1976:

If upon termination of the Plan, there is an amount remaining in the trust fund after satisfying all liabilities to members and their beneficiaries, then, and not otherwise, the trustee shall apply the amount so remaining in the trust fund pro rata to the benefit of each class set forth in Subsection XI–7, as

recommended by the actuary for the Plan, and approved by the Retirement Board. (Complaint § 18, Exhibit A to Order to Show Cause filed October 30, 1981)

Section 11.7 sets forth the allocation of funds to members of the plan and contains no provision for payment of any funds to the Company. (*Id.*)

4. All references to the complaint are to the Amended and Supplemental Complaint, unless otherwise noted.

5. The complaint alleges that A & P reported a net loss of $3,807,000 for the 1979 fiscal year and a net loss of $43,049,000 for the 1980 fiscal year. (Complaint ¶ 25) A & P's financial plight is discussed extensively in the affidavit of James Wood, A & P's Chairman and Chief Executive Officer.

Plaintiff also alleges that A & P's contributions to its plan has resulted in an "overfunding," with "excess assets" of approximately $200,000,000 as of October 15, 1981. (Complaint ¶ 24) It is noted at this juncture that all contributions to the plan were by the employer.

1981 to provide for the distribution of excess assets to A & P and had thereafter sought to terminate the plan.[6] A & P asserts that it had never been its intention permanently to provide for distribution to plan participants of excess assets in the plan fund upon termination. According to A & P, the plan had, since its inception (except for the period 1973–1981), always provided for distribution of excess assets to A & P upon termination. Due to erroneous actuarial assumptions, the excess in the plan had grown too rapidly for A & P, by reducing its contributions, to eliminate it. It is contended that it was feared that this excess might attract a corporate raider who, after acquiring control of the company, could terminate the plan, seize the excess assets under the existing plan provisions, and thus recoup its takeover expenses. A & P claims that, solely to forestall such a calamity, in 1973 it amended Section 8 of the plan, which had provided for allocation of excess assets to A & P upon termination, to provide instead that such excess would be distributed to plan participants. (Answer ¶¶ 18–19) This change was, however, itself subject to revision, A & P claims, by reason of broad powers of amendment, as reflected in Section 10.1 of the 1973 revised plan:

> RIGHT TO AMEND. The Board of Directors reserves the right at any time and from time to time to modify or amend in whole or in part, retroactively or otherwise, any or all of the provisions of the Plan, provided that no such modification or amendment shall make it possible for any part of the funds of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of members or their beneficiaries and for the administrative expenses of the Plan, *prior to the satisfaction of all liabilities with respect to such persons.* (emphasis supplied)[7]

The term "all liabilities," A & P contends, does not embrace excess assets, but refers to liabilities for accrued benefits; thus A & P acted legally in June 1981 when it amended the plan to provide for distribution to it of excess assets upon plan termination.

A & P asserts a number of affirmative defenses: amending the plan was consistent with the plan and permissible under Sections 302(c)(8) and 4044(d)(1) of ERISA, 29 U.S.C. §§ 1082(c)(8) and 1344(d)(1); former Section 11.4 (the 1973 amendment allocating excess assets to participants) either created no vested rights or was an illegal amendment to the plan; A & P made no representations regarding the distribution of excess assets to participants upon which the participants could have relied to their detriment; under the plan the Retirement Board of the plan had initial jurisdiction to consider the propriety of the June 1981 amendment and had properly decided the amendment was permissible; and, finally, the action was barred by the applicable statute of limitations.

Defendants also assert a counterclaim against the individual and class plaintiffs. The counterclaim alleges that in June 1981 the A & P Board of Directors, acting pursuant to Section 10.1, *supra,* adopted the following amendment to Section 11.4 of the Plan:

> 11.4 Upon termination of the Plan, any residual assets of the Plan shall be distributed to the Company if—
>
> (A) All liabilities of the Plan to members and their beneficiaries have been satisfied; and
>
> (B) The distribution does not contravene any provision of law.

This amendment, it is contended, was adopted to eliminate an inconsistency between Section 11.4 of the plan, which, prior to the June 1981 amendment, provided for distribution of excess assets to plan partici-

---

6. Four of the individuals and a partnership named as defendants reside abroad and have not been served with the summons and complaint. Given the relief sought by plaintiff, however, none of these individuals or entities is a necessary party to this action.

7. The text of the plan has at times employed Roman numerals to designate different sections. For convenience, the court will refer to sections of the plan by their corresponding Arabic number.

pants, and Section 8.5 of the plan, which provided:

(5) NON–DIVERSION. The principal or income of the trust fund shall not inure to the benefit of any of the Companies or be used for any purposes whatsoever other than for the exclusive benefit of members or their beneficiaries, or to meet the necessary expenses of the Plan, except that, after all liabilities under the Plan have been satisfied, any property remaining in the trust fund as the result of erroneous actuarial computation shall be distributed by the trustee to the Company.

The counterclaim alleges that the inconsistency arose as the result of A & P's aforesaid efforts in 1973 to discourage takeover attempts by providing for distribution of excess assets to plan participants. The counterclaim further alleges that in 1973 A & P deliberately refrained from altering the amendatory section of the plan (Section 10.1), so that A & P could reamend the plan in the future.

The counterclaim also alleges that the plan was and is a defined benefit plan, containing a "Benefits" section providing specific retirement benefits to A & P employees and their beneficiaries, based on salary and years of service. The plan is a non-contributory pension plan: all contributions are made annually by A & P; the employee members make no contributions. It is also alleged that A & P did not deliberately overfund the plan but rather made contributions based on its actuaries' advice as to the amounts needed to fund its pension liabilities.

The counterclaim seeks dismissal of the complaint with prejudice and a declaration that the excess assets may be distributed to A & P on termination of the plan.

Defendants filed a Supplemental and Amended Answer and Counterclaim (Amended Answer) on March 10, 1982, in which they assert that the plan had been amended in 1975, reinstating the pre-1973 provisions allocating termination surplus to A & P; and that A & P's Minute Books reflect a November 13, 1975, amendment by A & P's Board of Directors eliminating the 1973 surplus allocation provision of Section 11.4 and a December 19, 1975, amendment by the Executive Committee of the Board of Directors adding the following language:

11.4 *Excess Assets.* If, upon termination of the plan, there is an amount remaining in the trust fund after satisfying all liabilities to Members and their beneficiaries then, and not otherwise, the trustee shall pay over to the Company the amount so remaining in the fund, provided that such distribution does not contravene any provision of law.

The affidavit of Arthur Melervey (Mlvy Aff.), filed June 29, 1982, explains the amendment to the A & P plan. In the latter part of 1975, reamendment of the plan was undertaken to conform it to ERISA. At the same time, consideration was given to eliminating the 1973 change in the surplus allocation clause and reinstating the concept of allocation to A & P in the event of termination. (Mlvy Aff. ¶ 28) A & P's actuaries prepared a draft of the proposed ERISA changes. The proposed draft excised the 1973 surplus allocation provisions and presented two new provisions—Sections 8.5 and 11.4—both of which provided that excess upon termination would be returned to A & P. *Id.* ¶ 29.

On November 13, 1975, the Board of Directors met and adopted a new form of the official plan text. This new plan text excised the 1973 allocation provision and adopted the proposed Section 8.5 but did not contain the proposed Section 11.4. *Id.* ¶ 30, Exhibit VII to Mlvy Aff. In addition to these changes, the Board authorized further changes by authorized officers to bring the plan into compliance with IRS regulations. *Id.* ¶ 31. Such further changes were made, and on December 19, 1975, the Executive Committee adopted a new restated form of the plan text, empowered to do so by plan Section 1.4. *Id.* This was done so that the revised plan could be approved before December 31, 1975. The version of the plan adopted by the Executive Committee thus contained both Sections 8.5 and 11.4 as proposed by A & P's actuaries.

Thus, the revised plan contained two provisions allocating surplus to A & P. *Id.*

Mr. Melervey reviewed the restated plan text on or about December 31, 1975. Because Mr. Melervey had some concern about Section 11.4 as contained in the restated plan text—which allocated surplus to A & P rather than to participants—he redrafted Section 11.4 to provide for allocation to participants. *Id.* at 32. He claims to have done this merely to bring to the consideration of the Executive Committee or the Board the desirability of prior court approval of the proposed change to Section 11.4. He did not regard himself as authorized to effect substantive changes in the plan text. *Id.*

On January 8, 1976, the Board of Directors approved the minutes of the Executive Committee's December 19, 1975, meeting. Thus, the Board effectively approved the restated plan document which the Executive Committee had adopted at its meeting. *Id.* at ¶ 33. In mid-January 1976 Melervey, in his role as Secretary, certified a copy of what had purportedly been adopted by the Executive Committee on December 19, 1975. However, Mr. Melervey mistakenly certified to the Board a restated plan document which contained his version of Section 11.4, rather than the version which had actually been adopted by the Executive Committee, which version allocated surplus to A & P. *Id.* ¶ 34. The erroneously certified document thus became the "official" plan text, although a version of the plan text which allocated surplus to A & P had actually been adopted by the Executive Committee and such action had been approved by the Board. Thus, the Amended Answer asserts, when A & P's Board of Directors acted in June 1981 to delete the erroneously certified Section 11.4 and to add the current Section 11.4 (which allocates termination surplus to A & P), they merely were resolving a conflict between Sections 8.5 and 11.4 in accordance with their broad amendatory powers under Section 10.1 of the plan.

The Amended Answer also sets forth a number of affirmative defenses, the substance of which will be treated below in the section of this opinion dealing with the plaintiff's likelihood of success on the merits.

### Jurisdiction and Venue

■ This court has jurisdiction over this action as to the First Count of the complaint under Section 502 of ERISA, 29 U.S.C. § 1132, and 28 U.S.C. § 1331. The claims set forth in the Second, Third and Fourth Counts of the complaint are within the pendent jurisdiction of this court.

■ Venue is proper, since the plan is administered, and the acts complained of occurred, in this district. 28 U.S.C. § 1391.

### Class Action Determination

■ It was determined on January 29, 1982, that this action would be maintained as a class action under Fed.R.Civ.P. 23(a) and 23(b)(1)(A) and (B), and 23(b)(2), the plaintiff class consisting of all plan members, former members, and their covered beneficiaries and that the counterclaim asserted by A & P and certain defendants against that class would also be maintained as a class action under said rules. This court found (as the parties had agreed) that the class was so numerous that joinder of all class members was impracticable, that there were questions of law and fact common to the claims made on behalf of and against the class, that the claims of plaintiff and his defenses to the counterclaim were typical of the claims and defenses of the class, that plaintiff's counsel would adequately represent the interests of the class, and that the counterclaimants had acted on grounds generally applicable to the class, thereby making appropriate final declaratory relief with respect to the class as a whole. It was also found that prosecution of separate actions by or against individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual class members and would establish incompatible standards of conduct for the counterclaimants and for the other defendants in the action. Moreover, there was the risk of adjudication

with respect to individual members of the class which would as a practical matter be dispositive of the interests of other individuals not parties to the litigation or which might substantially impair or impede their ability to protect their interests. This court further ordered that, pursuant to Fed.R. Civ.P. 23(d)(2), notice of the class action go to all present and former members of the plan by publication of a notice once in the Eastern Edition of the Wall Street Journal and once in The Newark Star Ledger, and by first class mailing of a notice addressed to the most recent address of persons whom A & P determined from its records to be members of the class. These directives have been complied with and the court finds that such is the best notice practicable under the circumstances.[8]

### Other Proceedings

On March 8, 1982, by reason of a hearing on defendants' motion to strike plaintiff's jury demand, the court was advised of counsel's view of the operative facts and applicable law. Decision on the motion was reserved.

On April 5, 1982, counsel jointly reported to the court that a settlement agreement had been reached in principle, contemplating that approximately $50 million of the excess assets would be devoted to increasing the benefits of A & P retirees, and that, under a new plan to be adopted, increased benefits to participants were likely.

When counsel for the plaintiff class and for the defendants subsequently submitted the Stipulation of Settlement to the court,[9] they advised that the named plaintiff, William Walsh, was opposed to its terms. Nonetheless, plaintiff's counsel and class counsel, Milton S. Gould, Esq., of Shea and Gould, was of the view that the settlement was fair, reasonable and adequate, imposing upon him as class counsel the obligation to submit the proposed settlement for consideration by the court and the class. The terms of the settlement are hereinafter discussed. *See* p. 655, *infra*.

Thereafter, on May 24, 1982, and June 1, 1982, the court received oral presentations and written submissions from counsel and Walsh on the fairness, reasonableness and adequacy of the proposed settlement.

Included in the submissions was defendants' draft of a contemplated summary judgment motion and supporting brief.[10]

---

**8.** After notice of this suit was given pursuant to this court's order, the court received through the clerk's office or from class members' submissions which are designated on the docket sheet of this action as "Notice to be excluded from class action." Inasmuch as this class action was certified under Rule 23(b)(2), individual class members do not have the right to "opt out" of the litigation. *See Laskey v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)*, 638 F.2d 954, 956–57 (6th Cir.1981). These submissions were signed mimeographed petitions containing the following statement:

We the undersigned, as employees of the Great Atlantic & Pacific Tea Company, Inc., do hereby wish to go on record that we are opposed to the Class Action No. 81–3377 filed by William I. Walsh in the United States District Court for the District of New Jersey. Thus, these submissions did not appear to request exclusion from the certified class, but merely expressed opposition to plaintiff's lawsuit.

**9.** The Stipulation of Settlement in substance provided that, subject to approval by this court and applicable government agencies, A & P would amend the plan so that $50,000,000 of the excess assets would be used to purchase non-participating annuities to increase the retirement benefits of the plan's participants. Of this amount, $40,000,000 would be allocated among retired A & P employees and terminated plan participants with vested pension rights and their covered beneficiaries, and $10,000,-000 would be allocated among plan participants who were employees of A & P on the date the plan terminated. (Stipulation of Settlement, ¶ 2(a)) The Stipulation of Settlement also provided that A & P would be entitled to the remainder of the excess assets and was conditioned on this court's entering a final judgment dismissing the complaint against the defendants and granting a declaratory judgment on the counterclaim in favor of A & P and the other counterclaimants. (Stipulation of Settlement, ¶ 2(b))

The settlement terms are hereinafter discussed in the text at p. 655.

**10.** This court has been advised that the defendants were about to file their summary judgment motion when settlement was agreed upon between counsel.

The court concluded on June 1, 1982, that submission of the proposed settlement to the class was warranted and set July 9, 1982, as the date for a hearing thereon.[11] Additionally, the court announced the appointment of Albert J. Kleinberg, Jr., of the firm of Wyatt & Co., as its expert on the actuarial and pension issues involved; and the appointment was consented to by counsel.

In addition to hearing Mr. Walsh's objections to the proposed settlement, and counsel's responses thereto, and deciding to put the proposed settlement before the class, the court approved a form of notice which was acceptable to all concerned.

■ Another hearing was held on June 9, 1982, following Mr. Walsh's June 2 request that Shea and Gould be discharged as class counsel and that Walsh be authorized to retain new counsel at A & P's expense. This application was denied. Counsel for the class, the court found, were acting appropriately in light of their conception of what was in the best interests of the class. While not unaware of Mr. Walsh's significant position in this lawsuit, the court recognized that

> the class itself often speaks in several voices. Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interest of the class as a whole.

*Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Plaintiff did not allege that the rights of a definable minority of class members were being sacrificed for the benefit of the majority. *See Pettway, supra,* 576 F.2d at 1216. Rather, plaintiff wished to discharge class counsel for having recommended submission of the proposed settlement for approval. This court had already determined, based upon submissions

of counsel, that the proposed settlement was sufficiently fair and reasonable to warrant notice to the class. It thus concluded that class counsel's submission of the proposed settlement did not warrant their dismissal and found that Mr. Walsh had failed to show that class counsel were not motivated by the best interest of the class. As the court wrote in *Parker v. Anderson,* 667 F.2d 1204, 1210–11 (5th Cir.1982):

> Necessarily, much of what counsel does for the class is by and through the class representatives, but that is neither the ultimate nor the key determinant. The compelling obligation of class counsel in class action litigation is to the group which makes up the class. Counsel must be aware of and motivated by that which is in the maximum best interests of the class considered as a unit.

*See also* Transcript of June 9, 1982, Hearing at 36–41.

At the June 9, 1982, hearing the court directed that Mr. Kleinberg, its court-appointed expert on the actuarial aspects of the fairness and reasonableness of the proposed settlement, be granted access by the parties to their actuarial data and to the actuaries retained by them in this matter.

The Notice of Proposed Settlement of Class Action was published in the Wall Street Journal and The Newark Star Ledger on June 7, 1982, and was mailed on June 10, 1982, to all class members who could be identified through reasonable effort.

The Notice informed class members of the proposed settlement and of their right to appear and object to, or support, the settlement and contained the following language:

> Plaintiff objects to the proposed settlement on the grounds that in his opinion it is unreasonable, inadequate and unfair. Counsel for the Class is of the opinion that the proposed settlement is fair, reasonable and adequate and should be presented to the Class and to the Court

---

11. The court's reasons for finding sufficient grounds for providing notice of the proposed settlement were and are the same as the reasons for finding the proposed settlement fair, reasonable and adequate. These reasons are detailed in the text hereafter. See p. 646, *et seq.*

for their respective consideration and should be approved.

The Notice also apprised class members that any questions about the settlement could be addressed to Mr. Walsh, counsel for the class, and/or to counsel for A & P.

Further communications to the court from Mr. Walsh objected to the aforesaid Notice, requested court appointment of additional class counsel to represent objecting class members, to be paid by A & P, and postponement of the July 9, 1982, hearing. Accordingly, the court convened counsel and Mr. Walsh on June 21, 1982. The court determined it was inappropriate to appoint additional counsel for the class.[12] It was noted that if, as Mr. Walsh urged, the proposed settlement was rejected, A & P had no obligation to pay any attorneys' fees, even to class counsel already in the case. Mr. Walsh was informed, as he had been at the June 9, 1982, hearing, of his right to retain separate counsel to represent him and like-minded class members, the court suggesting that, given Mr. Walsh's claim as to the number of objecting class members, the expense involved did not represent a significant financial burden upon the objectors.

As to Mr. Walsh's request that the hearing on the fairness of the settlement be postponed to allow interested class members more time to consider the matter, and to retain counsel and prepare their opposition to the proposed settlement, the court, deeming the request reasonable, set the hearing for September 21, 1982.

Finally, having received information that some class members who had received the Notice of Proposed Settlement had the erroneous impression that current pension benefits under the plan might be terminated or reduced as a result of these proceedings, the court ordered that a further notice be mailed and published, advising class members of the new hearing date and eliminating the concerns raised by the earlier notice. Such notice was duly mailed and published.

The hearing on the fairness, reasonableness and adequacy of the proposed settlement was held on September 21, 1982.

Mr. Walsh spoke in opposition to the proposed settlement. He contended that A & P's attempt to divert excess assets to itself constituted a breach of contract and a violation of defendants' fiduciary duties. A & P counsel emphasized the possibility that if termination was not permitted, it could simply continue to use the surplus to fund current plan contributions, as it had done in the past. Class counsel, speaking at length, detailed his analysis of the case and the negotiations which had culminated in the proposed settlement. *See also* Gould Aff. ¶¶ 14–22.

Members of the class also addressed the court. Most expressed the difficulties faced in living on their pensions and stated that they felt plan participants were entitled to all the excess funds in the plan. A few members spoke in favor of A & P's position in the lawsuit and urged the court to approve the proposed settlement. Some members were represented by counsel, although most were not. Further analysis of objections appears at pp. 655–657, *infra*.

At the conclusion of the hearing, the court directed A & P's counsel to submit memoranda addressing those concerns which were aired for the first time at the hearing. These submissions, as well as a number of post-hearing submissions of plaintiff, have been received and the court, having reviewed all submissions, now addresses the legal principles implicated in evaluating a proposed class action settlement.

*Discussion of the Fairness, Reasonableness and Adequacy of the Proposed Settlement*

█ The basic question raised by the proposed settlement under Fed.R.Civ.P. 23(e) is whether the compromise reached between the class and A & P is fair, reasonable and adequate. *See Weinberger v. Kendrick,* 698

---

12. The reasons were essentially the same as those which led to the court's denial on June 9,

1982, of the earlier application to remove class counsel.

F.2d 61 (2d Cir.1982). In *Weinberger,* the court wrote:

Determination whether a proposed class action settlement is fair, reasonable and adequate involves consideration of two types of evidence. The primary concern is with the substantive terms of the settlement: *"Basic to this . . . is to compare the terms of the compromise with the likely rewards of litigation." Protective Committee for Independent Stockholder of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–425 [88 S.Ct. 1157, 1163, 20 L.Ed.2d 1] (1968). See also *Newman v. Stein, supra,* 464 F.2d 689; *City of Detroit v. Grinnell Corp., supra,* 495 F.2d [448] at 455.

698 F.2d at 73 (emphasis added).

■ In this circuit guidance is provided by *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), wherein the court stated:

Consideration of the merits of the case is one step in determining the likely rewards the class would secure, if any, from prosecuting the litigation to a conclusion. *United Founders Life Insurance Co. v. Consumers National Life Insurance Co.,* 447 F.2d 647, 655–56 (7th Cir.1972); *cf. Protective Committee v. Anderson,* 390 U.S. 414, 424–425, 88 S.Ct. 1157 [1163], 20 L.Ed.2d 1 (1968). The court, of course, need only evaluate the probable outcome of the litigation and is not required to weigh and decide each contention; further, the probable result at trial must be balanced against the probable costs, in both time and money, of continued litigation.

*Bryan, supra,* 494 F.2d at 801. Thus, we must examine and weigh generally the strength of the plaintiff's case as against the amount offered in settlement.[13]

■ Additionally, in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), the Third Circuit noted that the complexity, expense and duration of a trial are additional factors to be considered.[14] 521 F.2d at 157. *See also Bullock v. Administrator of Estate of Kircher,* 84 F.R.D. 1, 10–11 (D.N.J.1979).

■ A hearing on a proposed settlement of a class action, however, should not be converted into a trial on the merits. Thus, in *Girsh v. Jepson, supra,* Judge Garth stated:

Nor by our remand do we suggest that a record appropriate to a trial on the merits is required. We recognize that the task of the district court is to determine whether the proposed settlement should be accepted and approved—a determination substantially different than a decision on the merits. However, in order to satisfy even the less rigorous evidential requirements for settlement approval, the district court must at least evaluate all the contentions of the parties and provide any objectors with an opportunity for meaningful exposition of their positions.

521 F.2d at 160 (citations omitted).

■ The decision whether to approve a proposed settlement of a class action is left to the sound discretion of the district court. *Girsh v. Jepson, supra,* 521 F.2d at 156; *Bryan v. Pittsburgh Plate Glass Co., supra,* 494 F.2d at 801. In exercising this discretion, a court should be slow to substitute its own judgment for that of experi-

---

13. The parties need not show success or failure to a certainty, but rather only the general strength or weakness of the plaintiff's case. *See Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982).

14. *Girsh,* citing to *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974), states the factors to be considered in determining fairness of a class action settlement as follows: (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of dis-

covery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of the reasonableness of the settlement fund to a possible recovery in light of all attendant risks of litigation.

521 F.2d at 157.

enced counsel who, as here, have arrived at a settlement after extensive litigation and a careful assessment of the risks and potential rewards involved in a full trial and appeal.

■ An important consideration in evaluating a proposed settlement is the plaintiff's probability of ultimate success. Given the limits upon the court's opportunity to assess all aspects of a case, the opinion and judgment of experienced counsel must be given substantial weight.

Class counsel here, it is noted, have recommended that the settlement be approved.[15]

■ As noted in *Girsh, supra,* a factor to be considered by the court in evaluating a proposed class action settlement is the reaction of the class. However, significant in this regard is *Bryan v. Pittsburgh Plate Glass Co., supra,* 494 F.2d at 803, where in rejecting appellants' contention that the district court abused its discretion by approving a class action settlement over the objection of more than 20% of the members of the class, Chief Judge Seitz stated:

> Appellants contend, however, that the district court abused its discretion in approving as fair and reasonable the particular settlement proposed here when more than twenty percent of the class plaintiffs objected. While the proportion of the class opposed to a settlement is one factor to be considered in assessing its fairness, *see* C. Wright & A. Miller, Federal Practice and Procedure Civil § 1797 and cases cited n. 42 (1972), a settlement is not unfair or unreasonable simply because a large number of class members oppose it. The drafters of Rule 23 chose as a means of protecting the class the requirement that the district court approve the settlement. They did not require rejection of a settlement on objection of a given part of the class.

■ Moreover, even where named plaintiffs join a substantial number of class members in objecting to the settlement of a class action, that settlement may still be deemed fair and adequate, warranting court approval. *Pettway v. American Cast Iron Pipe Co., supra,* 576 F.2d at 1215. In *Parker v. Anderson,* 667 F.2d 1204 (5th Cir. 1982), all but one of the eleven named plaintiffs objected to the settlement and contended that counsel for the class did not represent the class fairly and adequately during settlement negotiations. The court, in upholding the district court's determination that the settlement was fair and that the record did not support the contention of inadequate representation by counsel, stated:

> The courts have recognized that the duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs. It has been held that agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable. . . . [T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands.

667 F.2d at 1211.

The court now addresses the pertinent issues in the light of the foregoing discussion of legal principles and the proceedings heretofore had herein.

### Complexity of the Litigation

This litigation has been and would be extraordinarily complex.[16]

The complexities of this case are aggravated by the lack of clear decisional prece-

---

15. The experience and qualifications of class counsel who negotiated the settlement now under review are set forth in the Gould Affidavit at ¶ 14. Indeed, the objectors have not challenged counsel's qualifications. The plaintiff, of course, is in no position to do so; he retained them. The analysis of the case, and its many problems, as set forth by Mr. Gould, demon-strates why the settlement before the court is a favorable one for the plaintiff and the class he represents.

16. As has been noted, the parties have submitted to the court extensive memoranda related to the pertinent issues.

dent on certain of the critical issues of this case, *e.g.,* (1) whether "surplus" assets constitute a liability to plan participants prior to termination; and (2) whether the steps taken to amend the plan and to direct excess assets to the company should be viewed as a single transaction and, if so, whether such an amendment is impermissible because enacted simultaneously with the amendment to terminate the plan at a future time. Plaintiff also raises, without persuasive argument or decisional support, a most novel issue by asserting that the existence of surplus assets in a plan, and an attempt to divert such assets to the employer, authorizes the court to terminate the plan and order the assets to be distributed instead to the plan participants. The answers to these questions would involve applications of ERISA, federal tax law, and, plaintiff argues, principles of contract law. Also to be considered are difficult public policy questions.

In more specific terms, the plaintiff claims that defendants breached their fiduciary duties to plan participants in adopting the June 26, 1981, amendment. Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), establishes that the obligation of fiduciaries is to discharge their duties "solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries, and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter."

Plaintiff alleges that defendants breached their duty of "unwavering loyalty" to plan participants imposed by this section, *see, e.g., NLRB v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), when it adopted the June 1981 amendment. Specifically, plaintiff claims that despite management's testimony that, as of June 1981, no decision had been made whether to terminate the plan (*see* Wood Dep. p. 70) and that the purpose of the June 1981 amendment was merely to eliminate inconsistencies in the plan (*see* Wood Dep. p. 69), plaintiff would be able to show that prior to June 1981 A & P directors were informed of management's decision to terminate the plan.

Beyond this issue of fact concerning adoption of the June 1981 amendment, plaintiff argues that this amendment violates § 404(a)(1) because it attempts to divest the participants' rights to benefits under the plan agreement and constitutes an unlawful diversion of plan assets. Plaintiff argues that the excess assets in the plan constitute "liabilities" to participants and can never be diverted to employer use.

A & P responds that the June 1981 amendment did not impair the participants' right to any benefit under the plan because at the time the amendment was adopted (*i.e.,* prior to plan termination), the right to excess assets was not a benefit of, or liability to, plan participants. First, A & P argues that, under the practices A & P followed for its plan, it was always A & P's intention to contribute annually an amount to its plan which would satisfy its obligations to pay defined benefits as they became due. In this respect, A & P always complied with actuarial recommendations made by A & P's actuaries as to the amount of contribution required each year. *See* Affidavit of Larry Margel (Mgl Aff.) at ¶ 22; Affidavit of Arthur Melervey (Mlvy Aff.) at ¶ 26, and Exhibit VIII thereto; Affidavit of William Eckert (Ekt Aff.) at

¶ 4(a); Affidavit of Dann Potts (Potts Aff.) at ¶¶ 4–6.[17]

According to A & P, the level of annual contributions was determined based upon various actuarial assumptions, including an indefinite duration of the plan, turnover rates, salary levels and earning capacity of the assets. *See* Mgl Aff. ¶¶ 6, 14–17. Had these assumptions been accurate, the Pension Fund surplus would never have developed. However, because of inaccuracies in the assumptions, an excess amount of funds developed above that amount necessary to satisfy participant liabilities, at least as those liabilities are defined by A & P.

During the life of the plan, at times predictions of the amounts required erred on the low side. A & P would, in those instances, increase its annual contribution. Conversely, when it developed that a prior contribution had exceeded the amount necessary to guarantee defined benefits, A & P would thereafter reduce or eliminate its annual contribution to the Fund. *See* Mgl Aff. ¶ 22; Mlvy Aff. ¶¶ 26, 44, Ex. VIII; Ekt Aff. ¶ 4(a); Potts Aff. ¶ 60. According to A & P's affiants, this is a standard practice with respect to defined benefit plans generally and is in accord with the funding provisions of the A & P plan. Mgl Aff. ¶ 20; Mlvy Aff. Ex. XIII p. 28. A & P asserts that at various points in the history of the plan excess assets would have existed had the plan been terminated. However, A & P employed the excess assets to fund new benefits and to expand plan coverage to new facilities or employees. *See* Mlvy Aff. ¶ 26, Ex. IX, X; Ekt Aff. ¶¶ 4(b), (c). A & P contends that the absence of any protest from plan participants on those prior actions indicates that participants never regarded surplus assets as part of their benefits. Finally, A & P states that, if the plan is not now terminated, it can simply continue the offset process which it has employed in the past and make no contribution to the plan in future years. *See* Wood Aff. ¶ 10(a); Brennan Aff. ¶ 24. Gradually, this would result in the elimination of the entire excess assets which would exist if the plan were terminated.

Plaintiff responds that A & P is estopped from terminating the plan and from gradually eliminating the "surplus" by suspending plan contributions, because of the reasonable expectations fostered by the plan text and the plan booklets distributed to participants. For example, in the 1960 booklet A & P stated:

Plan Continuance

The Company hopes and expects to continue the Plan indefinitely, but reserves the right to amend or discontinue it at any time. Of course, anything you can do to keep our business successful will help assure the Plan's continuance. However, if the Plan should end, all Plan Funds must be used for the benefit of members and their beneficiaries.

Plaintiff also claims that reasonable expectations were fostered by Section 11.4 of the plan as adopted in 1973, which allocated surplus in the event of termination to plan participants. Plaintiff also argues that the plan as it existed in 1973 constituted a binding agreement which could not be unilaterally altered by A & P for its own benefit.

Additionally, in recent submissions to this court, plaintiff, acting without counsel, argues that partial terminations of the A & P plan have occurred and that these partial terminations entitle the participants to the

---

**17.** Eight affidavits were submitted by A & P at the time A & P submitted its second draft of the contemplated summary judgment motion. Of these, one is by William Kane (Kane Aff.), former Chairman and Chief Executive Officer of A & P; another is by Dean Potts (Potts Aff.), former Vice President, Treasurer and Secretary of A & P. The remaining affiants are Larry Margel (Mgl Aff.), actuarial consultant to the Plan; Arthur Melervey (Mlvy Aff.), Corporate Secretary; James Wood (Wood Aff.), Corporate Chairman and Chief Executive Officer; William Eckert (Ekt Aff.), Secretary of the Retirement Board; Donald Grubbs (Grubbs Aff.), former Director of the Actuarial Division of the Internal Revenue Service (IRS) and former Chairman of the Joint Board for the Enrollment of Actuaries under Section 3041 of the Employees Retirement Income Security Act of 1974 (ERISA); and Larry Brennan (Brennan Aff.), an actuarial consultant.

excess assets. Plaintiff has also argued that past mergers between the A & P plan and other plans have resulted in a binding commitment that participants receive any excess assets. Finally, as an overall argument, A & P contends that all of plaintiff's arguments concerning the impropriety of plan termination have been previously considered by the Retirement Board of the plan pursuant to the exclusive authority vested in it by the plan text, and that the decision of the Board approving termination may not be overturned absent a showing that it was arbitrary and capricious. *See* p. 636, *supra.*

This multitude of complex legal and factual issues makes inevitable lengthy and expensive litigation. Indeed, given the many legal issues of first impression, the parties would face not only an appeal to the court of appeals but, as well, a likelihood of Supreme Court review. These anticipated procedures assume additional weight here; many of the class members are elderly retired persons who might not survive to share in the fruits of a protracted litigation, even if the plaintiff class prevailed, whereas they will derive immediate benefits from a settlement now.

### Likelihood of Success

Closely related to the question of the complexity of the lawsuit is the question of plaintiff's likelihood of ultimate success in evaluating the proposed settlement. *See Kusner v. First Pennsylvania Corp.,* 74 F.R.D. 606 (E.D.Pa.1977), *aff'd mem.* 577 F.2d 726 (3d Cir.1978). In addition to class counsel's recommendation that the settlement be approved, this court's independent analysis of the abundant submissions leads it to conclude that plaintiff has only a slight chance of ultimately prevailing in any meaningful way.

#### A & P's recoupment of the surplus

The two leading cases dealing with the recoupment of pension fund assets are *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.,* 624 F.2d 513 (4th Cir.1980), and *In re C.D. Moyer Company Trust Fund,* 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd,* 582 F.2d 1273 (3d Cir.1978), although neither dealt explicitly with the question whether excess assets represent an employer's liability to participants prior to termination. *Audio Fidelity* held that an employer could not retroactively amend its pension plan, after termination, to provide for diversion of excess assets to the employer. The *Audio Fidelity* pension agreement had provided that upon termination any excess assets would be distributed to participants. The employer argued unsuccessfully that the broad amendatory power granted in the text agreement permitted such a change.

Plaintiff here would rely upon *Audio Fidelity* and argue that the language of the A & P plan entitled the participants to excess assets. *Audio Fidelity,* however, lends no support to plaintiff's position; the crucial factor there influencing the court was that the challenged amendment occurred after the plan's termination. As the court wrote:

> On the date of termination, Audio no longer was obligated to make contributions, and the participants no longer were entitled to accrue additional benefits. The rights of both parties became fixed, and substantive modifications of the plan altering those rights were precluded. The scheme established by ERISA relies upon the provisions of each plan at the time of termination. It would defeat congressional intent ... if retroactive amendments after termination could alter substantive rights of the pension plan.

624 F.2d at 517.

In this case the plan has not been terminated. The amendment providing that the excess assets would go to A & P was enacted June 26, 1981, while the plan was ongoing. The announcement that the plan would be terminated on December 31, 1981, was not made until October 1981.

More in point is *Moyer, supra.* The court there upheld a pension plan amendment allocating excess assets to the employer, where the amendment was enacted only 18 days before termination. The Pension Benefit Guaranty Corp. (PBGC) had contended that, although the employer had a power of amendment similar to that found in the A

& P plan agreement, the power was limited, so as to preclude enactment of the challenged amendment, by another provision of the agreement which read:

It shall, however, at all times be impossible, if any alteration, amendment or revocation be made pursuant to this provision, for any of the trust corpus or income to be diverted or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries.

The *Moyer* court rejected PBGC's interpretation. 441 F.Supp. at 1131. The court found that, in light of the plan agreement as a whole, the parties did not contemplate that, at the time of termination, there would be an excess due to overfunding and, therefore, the phrase "trust corpus or income" referred to such funds as were necessary to insure the plan's specified obligations to participants. The court also wrote:

The result is consistent with the policies underlying the enactment of ERISA. Employers will continue to fund their plans under ERISA guidelines, but will not be penalized for overfunding in "an abundance of caution" or as a result of a miscalculation on the part of an actuary. Thus, employees will continue to be protected to the extent of their specific benefits, but will not receive any windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis.

441 F.Supp. at 1132–33.

Here the court would be required to interpret the amendatory clause in the plan, Section 10.1, which provided A & P with a broad power of amendment, subject only to the limitation that "no such modification or amendment shall make it possible for any part of the funds of the plan to be used for, or diverted to, purposes other than for the exclusive benefit of members or their beneficiaries and for the administrative expenses of the plan, *prior to the satisfaction of all liabilities with respect to such pensions.*" (emphasis added). The court's reading of the plan agreement as a whole persuades it that the preferred interpretation is that "liabilities" as used in Section 10.1 does not embrace surplus assets prior to termination.

First, even with the 1973 amendment (allocating surplus to participants) in place, the plan contained a separate "Benefits" section (Section 4) which set forth the specific benefits and the method (based on earnings and years of service) for ascertaining such benefits to which a member would be entitled upon his retirement. There was no reference in this "Benefits" section to a participant becoming entitled to a portion of the excess assets upon retirement. The "Contribution" section of the plan (Section 5) continued to retain the concept that contributions would. be geared towards enabling the plan to meet its benefits obligations described in the Benefits section. The "Contributions" section did not imply that an excess was being or would be generated. Section 8 of the plan, the "Termination" section, expressed the intention that the plan would continue indefinitely. "Surplus" can have no meaning prior to termination; the intent expressed by Section 8 does not imply that excess assets were a current liability to participants.

Furthermore, Section 8 of the plan, as it existed after the 1973 amendment, set up six classes of plan participants for purposes of establishing the order in which plan assets would be used to satisfy its "liabilities" to plan participants. This section provided that no plan assets would be used to satisfy liability to a particular class unless the liability owed to all classes above that class had been satisfied "in full." This provides additional support for the likely conclusion that "liabilities" embraced the specific benefits outlined in Section 4 and not surplus. Otherwise, this provision of Section 8 would be meaningless since the obligation to a particular class could only be satisfied "in full" if the amount paid included a share of the excess assets. The amount of excess could only be calculated after satisfying the liabilities of lower classes; however, it would not be possible to satisfy the liabilities of the lower classes until the higher classes were paid in full. This bizarre out-

come would result from defining "liabilities" to include excess assets prior to termination.

Thus, the court believes it is likely that it would ultimately conclude that, prior to termination of the plan, the word "liabilities" in Section 10.1 includes only those amounts necessary to satisfy liabilities under Section 4, the "Benefits" section, and does not embrace the amount which would remain as surplus in the event of termination. Accordingly, under its amendatory power, A & P had the power to alter the plan so as to provide unequivocally that, in the event of termination, excess assets remaining after payment of benefits would go to the company. A conclusion that Section 10.1 provided A & P with the power to amend the plan prior to termination to obtain excess assets in the event of termination would of course be fatal to plaintiff's claims.[18]

*The plan booklet*

Plaintiff also has relied upon language in the plan booklet that, upon termination, all funds would go to plan participants. This reliance is now misplaced in light of *Van Orman v. American Ins. Co.,* 680 F.2d 301

(3d Cir.1982), decided after the complaint herein was filed. In *Van Orman,* pension plan participants sued for excess assets in a pension fund. They argued, *inter alia,* that language in the booklets describing the pension plan controlled over contradicting language in the text of the pension plan agreement. The text of the booklets provided that all pension funds would be used for the exclusive benefit of participants, while the text of the plan agreement provided that excess due to erroneous actuarial assumptions would revert to the company. The *Van Orman* court ruled that employees were thus put on notice that the plan text was controlling. The *Van Orman* court also affirmed the district court's holding that nothing in the plan booklet would lead one to an expectation of a lump sum payment in addition to the specific benefits provided by the plan. The court notes that, in *Van Orman,* unlike here, the participants contributed to the plan.

*Van Orman* has two implications detrimental to plaintiff's position here. First, it is uncontradicted that the A & P plan booklets periodically distributed to plan mem-

---

18. In *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Company,* 555 F.Supp. 257 (D.D.C.1983), a union sought to prevent an employer from recovering excess assets which would come into existence upon the termination of a non-contributory pension plan. The plan was governed by two documents—the official plan text and a Trust Agreement. The plan text provided that excess assets due to erroneous actuarial assumptions would revert to the employer. The Trust Agreement did not expressly permit such reversion. The Trust Agreement did provide for amendments, subject to the limitation that such amendments could not divert trust funds to any use other than for the exclusive benefit of participants.

The employer amended the Trust Agreement to expressly provide for reversion. The union sought to prevent reversion, relying upon the language of the Trust Agreement that all trust funds were to be used for the "exclusive benefit" of participants. The court upheld the employer's amendment to the Trust Agreement. The court concluded that the "exclusive benefit" limitation on the power to amend the Trust Agreement did not prevent the employer from obtaining those assets remaining after satisfaction of the benefits defined by the defined benefits plan.

The *Washington Star* court was influenced by the provision of the official plan text which permitted reversion of excess amounts due to erroneous actuarial computations. *Washington Star, supra,* at 261. Nevertheless, *Washington Star* is instructive with respect to the power of A & P to amend the plan text to provide for reversion. Section 10.1 of the 1973 revised A & P plan is broader than the amendatory provision of the *Washington Star* Trust Agreement in that the A & P plan expressly provides that funds can be used for purposes other than the exclusive benefit of participants after the satisfaction of all liabilities to participants. Thus, *Washington Star* militates in favor of permitting the challenged A & P amendment under A & P's power to amend the plan.

The court already has explained why it feels the most likely conclusion is that "liabilities" cannot include, during the life of the plan, excess assets which come into existence only upon the termination of the plan. Given this probable outcome, it also is likely that, as in *Washington Star,* the court would conclude that A & P had the power under section 10.1 to effect the challenged 1981 amendment providing for reversion. *See also Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D.N.Y.1979), *aff'd,* 622 F.2d 575 (2d Cir.1980).

bers contained a "warning" provision concerning the controlling effect of the official plan text and informed them of the availability of the plan document for their inspection. As has been noted, it is the court's belief that the proper interpretation of the plan text is that, even after the 1973 amendment, A & P retained the power to amend the plan prior to termination to eliminate or alter the provision of the plan giving excess assets to the participants. Second, a reading of the plan booklets does not create any reasonable expectation of a lump-sum payment over and above the specified defined retirement benefit. For example, in a section of the plan booklet annexed to plaintiff's complaint captioned "WHAT WILL I RECEIVE FROM THE PLAN?", the specific retirement benefits and the precise formula for calculating them are set forth and surplus is not even mentioned. This reasoned analysis, particularly as illuminated and fortified by *Van Orman,* makes it a virtual certainty that plaintiff would not prevail on his theory that the plan booklets created a reasonable expectation of entitlement to surplus which estops A & P from adopting the June 1981 amendment. Not surprisingly, at the September 21, 1982, hearing, Mr. Gould, class counsel, asserted that *Van Orman* significantly weakened plaintiff's argument concerning reliance upon the plan's pamphlets. *See* September 21, 1982, Tr. at 54. Mr. Gould described the "reliance" argument as one of the strongest aspects of plaintiff's case. *Id.* As Mr. Gould remarked with respect to *Van Orman,* "[O]ne of the pillars that held up the temple has been removed." *Id.*

### The breach of fiduciary duty argument

Plaintiff argues that the enactment of the June 1981 amendment amounts to a breach of the fiduciary duty owed under ERISA to the plan members by the defendants and that the planned termination thus constitutes an unlawful diversion of plan assets. This argument falls in the face of the court's conclusion that "liabilities" or "benefits" owed do not comprehend a right to excess assets prior to termination. It follows that the A & P directors acted properly when they amended the plan in June 1981. That the A & P directors did not violate their fiduciary duty to participants appears from Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), which provides:

> Any residual assets of a single employer plan may be distributed to the employer if—
>
> > (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
> >
> > (B) the distribution does not contravene any provision of law, and
> >
> > (C) the plan provides for such a distribution in these circumstances.

Accordingly, because it would appear that "liabilities" do not include excess assets prior to termination and that the June 26, 1981, amendment was authorized by the amendment power in Section 10.1, it must be concluded that A & P has complied with Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), and has not breached its fiduciary duties to participants under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).

### The Retirement Board

Under Section 9.7 of the plan agreement, the Retirement Board has the power to interpret the terms and provisions of the plan and to determine all questions arising thereunder. Although not requested to do so by Mr. Walsh, the Retirement Board has considered his claims and has determined they are without merit. A & P argues that pursuant to Section 9.9 of the plan, the determination of the Retirement Board is final and cannot be overturned unless it is "arbitrary and capricious." *See, e.g., Rosen v. Hotel and Restaurant Employees & Bartenders Unions,* 637 F.2d 592, 596 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Resolution of this issue would have added to the complexity of the litigation. I do not believe it is necessary to resolve this issue at this stage because, as indicated above, the court feels that it is likely that defendants would prevail on the merits, if the court were to reach the merits.

*The relief sought by the plaintiff*

It is important to understand the relief plaintiff would ultimately have this court grant him. He seeks more than simply an order enjoining A & P from terminating the plan and recovering the excess assets; Mr. Walsh also wants this court to act affirmatively to compel A & P to terminate the plan and distribute the excess assets to the participants. Alternatively, he requests an order requiring A & P to employ the excess assets in some as yet unspecified fashion to increase the pension benefits of plan participants.

Plaintiff has offered no case law for the proposition that the existence of a "surplus" in a pension fund warrants the relief he seeks by way of a mandatory injunction; and this court is at a loss to understand what basis in logic would support this requested relief. The 1973 amendment provides only that, in the event the plan is terminated, excess assets will be distributed to participants. Nothing in the text of the plan expressly or even by fair implication provides that, in the event of overfunding, the participants can compel termination.

It is undisputed that, prior to this lawsuit, the plan fund was "overfunded" in the sense that, if termination were to have occurred, excess assets would have remained after satisfying liabilities created by the "Benefits" section of the plan. Yet, A & P employed such excess assets in a variety of ways, such as by eliminating or reducing its contributions to the fund or by extending benefits or coverage. This was done without protest from any of the participants; none claimed a right to any part of such "excess." If A & P was enjoined from terminating its plan, it could do what it has threatened to do should this proposed settlement be rejected: simply revert to its prior policies, including the suspension of contri-

butions, and thus gradually eliminate the excess assets. Thus, plaintiff faces the prospect that, after a long and expensive fight, even if he should prevail in enjoining A & P's contemplated course of action, his victory would be a hollow one.[19]

The court's conclusion that plaintiff's arguments lack merit is consistent with the report and opinion of the court-appointed actuary, Mr. Kleinberg. His report states that a judicial determination that defendants breached their fiduciary duties in adopting the June 26, 1981, amendment would "present [*sic*] plan trustees and sponsors from ever terminating, or freezing plans, or from cutting back on future accruals of benefits. I know of no such interpretation of the fiduciary rules of ERISA, and I believe such a provision would have a negative effect on the installation of new plans, the improvement of old plans, and the proper funding of all plans." Comments Regarding the Case of William I. Walsh, plaintiff Against the Great Atlantic & Pacific Tea Company, Inc., et al., Defendants, at 2. (Comments) Mr. Kleinberg added that, "(t)he funding assumptions and methods employed [by A & P] during the years from 1972 to 1982 appear well within the mainstream of actuarial practice." *Id.* at 3. He found no impropriety in the accrual of excess assets in the plan fund as a result of mistakes in predictions concerning the size of the A & P work force: "The policy of the actuary to reflect the decline in force only as it occurred is customary, appropriate and reasonable under the circumstances." *Id.* at 4. Mr. Kleinberg stated "that the surplus did indeed arise from 'erroneous actuarial computation' and from no other cause." *Id.* He was also of the view that it would be "injurious of the security of pension plans in general to allow their members to compel distribution merely because of the existence of surplus." *Id.*

---

**19.** This court believes plaintiff realizes that there is no legal basis for compelling A & P to terminate its plan. At the September 21, 1982, hearing on the fairness of the proposed settlement, Mr. Walsh said, "Members have never claimed that the 1973 amendment guaranteed a surplus, prior to termination or at any time. Members do not claim that the termination

must take place, and members do not care at all whether or not surplus is an accrued benefit." Transcript of September 21, 1982, Hearing at 10. What plaintiff fails to realize, however, is that without this final, crucial aspect of the requested relief, any victory that might be obtained through litigating this case to a conclusion would be a hollow one.

Mr. Kleinberg's views do not constitute answers to the legal questions posed by this case; however, they do shed light upon the underlying policies involved.

*Summary*

In summary, to obtain the relief he requests, plaintiff would have to prevail on all of the following: that he is not bound by the Retirement Board's adverse decision; that excess assets are liabilities prior to termination and that the 1973 amendment created a binding commitment on A & P's part which could not be altered through the exercise of the amendatory powers of Section 10.1; and finally, that he is entitled to mandatory injunctive relief compelling A & P to terminate the plan and distribute assets to participants, or, alternatively, that the court should order A & P to increase benefits under the existing plan.

*Plaintiff's post-hearing contentions*

Two additional points raised by plaintiff in his post-hearing submissions have also been considered by the court. Plaintiff argues that the June 26, 1981, amendment to the A & P plan is an illegal retroactive amendment because one or more "partial terminations" of the plan have already occurred by reason of A & P's store closings, thus entitling the class to the excess assets in the plan fund.

■ This argument fails to enhance plaintiff's case. A & P's response, the October 7, 1982, affidavit of Donald S. Grubbs, Jr., supports this court's conclusion that, even if the Commissioner of the Internal Revenue Service was to determine that "partial terminations" have occurred, it would only have the effect of vesting the benefits of those plan participants affected by the partial terminations, to the extent that those benefits were funded at the time of the partial terminations. Plaintiff's assertion that such partial terminations would entitle participants to the entire surplus substantially depends upon his view that, as a result of the 1973 plan amendment allocating surplus to participants, excess assets are a "liability" prior to termination, a position the court discredits. Plaintiff would also assign to a partial termination while the 1973 amendment was in effect, the significance of a total termination, that is, having the result of accrual of the contingent benefit of entitlement to the excess assets. It is the court's view that this contention lacks merit. *See generally Pension Benefit Guaranty Corp. v. Dicenso*, 698 F.2d 199 (3d Cir.1983).

First, Section 411(d)(3) of the Internal Revenue Code, 26 U.S.C. § 411(d)(3), distinguishes between (i) a complete and total termination of a plan and (ii) a situation involving the severance from an ongoing plan of a portion of its members under circumstances deemed by the Internal Revenue Service to constitute a "partial termination." *See* Grubbs Affidavit of October 7, 1982, ¶ 6. Section 411(d)(3) states that a plan is not entitled to a tax exempt status unless it provides that, in the event of its termination or partial termination, "the rights of all affected employees to benefits accrued to the date of such termination [or] partial termination . . . to the extent funded as of such date . . . are nonforfeitable." Treasury Regulation § 1.411(d)–2 distinguishes between "termination" and "partial termination" (Treas.Reg. § 1.411(d)–2(a)(1)(i) (1977–1978)), and provides that, in the event of "partial termination," the requirements of Section 411(d)(3) "only apply to the part of the plan that is terminated" (Treas.Reg. § 1.411(d)–2(b)(3) (1977–1978)).

The effect of Code Section 411(d)(3) and Treasury Regulation § 1.411(d)–2 is that where "partial termination" occurs, those affected former employees who would have lost their accrued benefits when their employment ended, because their term of service was not long enough for their benefits to vest, do not lose them to the extent that such accrued benefits are then funded. A partial termination does not mean that the plan is totally terminated, however. Section 4043(b)(4) of ERISA, 29 U.S.C. § 1343(b)(4), provides that where a "partial termination" within the meaning of Code Section 411(d)(3) has occurred, such partial termination "does not, by itself, constitute or require a termination of a plan under this title." Furthermore, Treasury Regula-

tion § 1.411(d)–2 provides that a plan is considered terminated as of a particular date if (1) the plan is voluntarily terminated by the plan administrator or (2) PBGC terminates the plan.

Turning to the instant case and the effect of the suggested "partial terminations" on the fairness of the proposed settlement and, more particularly, on the plaintiff's likelihood of success on the merits, the court has stated its conclusion that defendants were likely to prevail on their argument that excess assets did not constitute a plan liability to participants prior to termination of the plan, and that, therefore, under the amendatory powers of Section 10.1, A & P was free to amend Section 11.4 to provide that excess assets would accrue to A & P upon termination (that is, complete termination) of the plan. It follows, as the court has also stated, that a right to excess assets is not a benefit which can accrue to an individual participant during the life of the plan. Thus, even assuming store closings can be said to be partial terminations, it would only result in those benefits defined in the "Benefits" portion of the plan becoming non-forfeitable to the extent they are funded by A & P's contributions. The persons affected by the partial termination would not become entitled then and there to a pro rata share of any excess assets. As long as the remainder of the plan remains ongoing, "excess assets" is a meaningless concept, since the amount of any surplus can only be calculated after a complete termination of the plan. Moreover, that any such partial termination may have occurred would not increase the plaintiff's likelihood of succeeding in his argument that a complete termination occurred while the 1973 amendment was in force—the only event which would have, under the court's view of the most likely interpretation of the plan text, entitled participants to excess assets.

Plaintiff also argues that the proposed settlement cannot be approved because, if partial terminations have occurred, those individuals thereby affected have become vested participants in the plan and, as such, must be joined in this class action so as to be provided with the opportunity to participate in the proceedings herein, including the right to comment upon the proposed settlement. Under plaintiff's view, the present class has been "miscertified" by reason of the court's failure to include these individuals in the class.

Putting aside the unanimous consent of all concerned to the court's class certification order, Treasury Regulation 1.401(d)–2(b)(1) provides that "whether or not a partial termination ... occurs shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case ...." There has not been a determination by the Commissioner that partial terminations have occurred. Thus, there are no individuals with vested benefits who have been excluded from this class action. Furthermore, the class certified in this action consists of members and former members of the A & P plan and, by definition, includes those former members who may have been affected by partial termination. Accordingly, the class has not been miscertified.

Additionally, as discussed in detail below, this court's approval of the proposed settlement is contingent upon approval of the planned termination by the IRS and PBGC. Plaintiff has stated that the issue of partial termination will be raised before the Commissioner of IRS when A & P seeks approval of the planned termination. Consistent with Treasury Regulation 1.411(d)–2(b), the Commissioner should determine whether or not partial terminations have occurred. Class counsel suggests that this court retain jurisdiction of this matter pending IRS and PBGC review, so as to review the Commissioner's determination as to partial termination, if such a review is sought. Defendants' counsel suggests that the court incorporate into its final judgment a provision that, if it is held that any "partial termination" has occurred, full provision is to be made for the payment of any newly-vested accrued benefits to the terminees involved, and such terminees will share in the benefits of the settlement. A & P would pay the amounts due any terminees from its

portion of the excess assets, rather than from the proposed $50 million settlement fund. The court accepts these suggestions and they will be incorporated in the accompanying judgment. Thus treated, the issue of partial termination does not affect the fairness of the proposed settlement.

Finally, plaintiff asserts in his latest post-hearing submission that the non-diversion proviso of a joint Company-Union plan makes it impossible for any part of the A & P plan fund to be made available to A & P. In August 1978, A & P's Board of Directors voted to merge the A & P plan (which, if it had been terminated at that point, would have had $50 million in excess assets) with a union-administered pension plan (the Terre Haute Plan). The Terre Haute Plan was at the time "underfunded" by $5 million; the resolutions which effectuated the "merger" indicate that the provisions of the two pension plans were to be distinct, even after merger. *See* Attachments to Letter of Denis McInerny, Esq., dated November 19, 1982. The Terre Haute Plan included a provision, Section 11.01, which reads:

> Irrespective of anything contained in the Plan or Trust Agreement as now expressed or hereafter amended, it shall be impossible for any part of the Trust Fund to be used for, or diverted to, any purpose not for the exclusive benefit of participants or their beneficiaries at any time prior to the satisfaction of all rights and liabilities with respect to participants or their beneficiaries hereunder, either by the operation, amendment, revocation or termination of the plan or trust agreement, and no part of the trust fund shall be paid, distributed or made available to the employer or the union at any time.

It is this section which plaintiff contends forbids the company from obtaining excess assets. This merger was effected, A & P contends, because the Terre Haute Plan was underfunded and the A & P plan was overfunded. Thus, merger would permit the Terre Haute Plan to remain ongoing through use of the excess funds in the A & P plan.

A fact issue exists whether this non-diversion clause of the merged plan was ever validly certified by A & P's Board of Directors. A & P maintains that when the two plans were merged, the non-diversion provision of the Terre Haute Plan, Section 11.01, was removed from the merged trust agreement. However, A & P claims that through inadvertence, a merged plan document was certified which mistakenly included the non-diversion language. *See* November 19, 1982, Letter of Denis McInerney, Esq., at 3–4. The court will not attempt to resolve this factual issue in this proceeding to review the proposed settlement and, for the reasons given below, concludes that plaintiff's arguments do not significantly affect the question of the likelihood of his success on the merits.

First, despite the non-diversion language, it is unlikely that plaintiff would succeed in compelling distribution of excess assets to participants. Without this final relief, the excess assets would remain in the plan fund, and A & P could suspend contributions and gradually absorb the "surplus," as A & P had done in the past. In such a situation, plaintiff and the class would receive nothing. Second, plaintiff himself argues that the merger of the two plans was impermissible under the A & P plan agreement. Plaintiff does not appear to realize that if he was to succeed on the latter argument and invalidate the merger, he could hardly argue that a provision of the merged agreement derived from the Terre Haute Plan prohibits termination of the A & P plan. In any event, the material submitted by A & P supports its contentions that even after merger, the two portions of the merged plan—Part A (A & P plan) and Part B (Terre Haute Plan)—were meant to be distinct, that is, that participants in Part B of the plan were not to participate in Part A of the plan, and vice versa. The reference to "the Trust Fund," A & P asserts, is to that portion of the assets of the merged plan attributable to Part B. A & P suggests that if plaintiff's reading of the proviso is given effect, it will mean that the entire excess of approximately $250 million will go to the few hundred participants of

the Terre Haute Plan, since "Part A" participants are barred from sharing in benefits with "Part B" participants.

Thus, after examining all of the legal issues which plaintiff has raised in opposition to the proposed settlement, including those contained in his post-hearing submissions, it is the court's view that there is little likelihood of plaintiff's succeeding on the merits in this litigation.

### Additional Factors

The court now addresses those additional factors, earlier alluded to, which are relevant to the determination of whether a proposed settlement is fair, reasonable, and adequate: (1) the complexity, expense and likely duration of the litigation; (2) whether the parties have bargained at arm's length, with the aid of competent and able counsel; (3) the stage of the proceedings and the amount of discovery completed and yet to be pursued; and (4) the reaction of the class members to settlement. *See, e.g., Girsh v. Jepson, supra,* 521 F.2d at 157; *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 455.

The complexity of this litigation has been earlier discussed at length. *See* pp. 643–646, *supra.* In addition to the court's conclusion that there is little likelihood that plaintiff would succeed on the merits in this litigation, an analysis of the remaining factors supports the conclusion that the proposed settlement is fair, reasonable, and adequate.

The affidavit of Mr. Gould, Esq., class counsel, filed September 15, 1982, (Gould Aff.) states that the terms of the proposed settlement are the result of lengthy negotiation between attorneys for the parties during the period of March, April, and May 1982 (Gould Aff. ¶ 14). During these negotiations, counsel for the class continued to conduct depositions.

The parties exchanged requests for the production of documents and interrogatories and served responses thereto. Pursuant to the document request served on behalf of plaintiff and the class, defendant A & P and certain individual defendants produced over 8,800 pages of documents (Gould Aff. ¶ 11). During the period of February through May 1982, class counsel took the depositions of Arthur C. Melervey, Jr., Corporate Secretary of A & P; Philip E. Heversten, former Senior Vice President-Finance, Treasurer and member of the Retirement Board of A & P; H. Nelson Lewis, Jr., Vice President, Industrial Relations and member of the Retirement Board of A & P; Harold J. Berry, Director of A & P; James Wood, Chairman and Chief Executive Officer of A & P; Grant G. Gentry, former President and Director of A & P; James G. Durfee, actuary with Towers, Perrin, Forster & Crosby; and Lawrence T. Brennan, partner of Kwasha Lipton (Gould Aff. ¶ 12). In addition, counsel for the class retained the services of an actuarial consultant to assist in preparing for the depositions of A & P's actuarial consultants (Gould Aff. ¶ 13).

The affidavit of Mr. Gould sets forth in detail the extensive settlement negotiations which resulted in the proposed stipulation of settlement. *See* Gould Aff. ¶¶ 14–22. Based upon this, and upon a review of the discovery undertaken in this case, the court concludes that the litigation had proceeded to a point where counsel could make an informed decision as to the relative strengths and weaknesses of this case. The court further concludes that the proposed settlement resulted from arms-length negotiations between counsel.

While the reaction of class members to a proposed settlement is also a factor to be considered, the court must balance the reaction of the class with all the other factors examined in considering the settlement, and can find the settlement terms fair, notwithstanding objections from the class. *See Pettway v. American Cast Iron Pipe Co., supra,* 576 F.2d at 1215.

The court received approximately 1,000 comments on the proposed settlement from a class of approximately 36,000 people. [Counsel for A & P, at the direction of the court, compiled an index of class submissions for this court's reference at the Sep-

tember 21, 1982, hearing.] Approximately one-half of the submissions to the court consisted of mimeographed texts in opposition to the proposed settlement, to which the sender had affixed his or her signature. Those handwritten objections received by the court expressed dissatisfaction with current A & P plan benefits and expressed the belief that the class was entitled to the entire surplus. Few addressed the most critical aspect of the proposed settlement, that is, its fairness, reasonableness and adequacy, and of course, the plaintiff's likelihood of success. Even if all of the objectors are counted, however, they still amount to only 2%–3% of the class. *See TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456 (2d Cir.1982) (class action settlement approved where over 54% of the class objected); *Bryan v. Pittsburgh Plate Glass Co., supra,* 494 F.2d at 803 (district court upheld in approval of class action settlement where over 20% of the class objected).

### The Terms of Settlement

The Proposed Stipulation of Settlement provides that certain amendments will be made to the plan. These amendments will result in the termination of the existing plan and the use of plan funds to purchase from insurance companies annuities which will pay benefits guaranteed to participants under the existing plan. According to the affidavit of James Rowe, Vice Chairman of the Board of Directors, after providing for these annuities and guaranteeing continuation of accrued benefits, there will remain approximately $250 million in excess assets. The Proposed Stipulation of Settlement also provides that, in addition to the benefits due under the plan, additional benefits, at a cost of $50 million dollars, to be paid for from the excess assets, will be apportioned among the class as follows: (1) Additional benefits having a cost of $40 million will be allocated among retired A & P employees and terminated plan participants with vested pension rights and their covered beneficiaries; the proposed settlement also provides that, for those A & P employees aged 55 or over who took early retirement on or after October 15, 1981, and whose benefits

commence on or before the date of approval of the proposed settlement, the benefits would include an option to have their retirement benefits recomputed on the basis of 100% retirement benefits at age 62; (2) Additional benefits having a cost of $10 million dollars will be allocated to "active" employees of A & P who are plan participants. Under the proposed settlement, these additional benefits will be funded by the purchase by the plan of non-participating annuities at a cost of $50 million dollars.

The Proposed Stipulation of Settlement does not guarantee a specific percentage increase in plan benefits to individual class members. Instead, as reflected by the Proposed Form of Amendment to the Pension Plan, the settlement funds ($40 million to "inactive" participants; $10 million to "active" participants), will be used to purchase annuities resulting in up to a 15% increase in individual benefits. In the event that the $50 million will purchase more than a 15% increase, however, the residual will be applied to further increase benefits. For the "inactive" members of the class, any residual amounts left after the purchase of $40 million dollars' worth of annuities will be divided so as to provide a larger relative increase to plan participants who have been retired for a longer period of time. For "active" members of the plan, any residual will be used to provide additional benefits. The Proposed Stipulation of Settlement also provides that, after approval of the settlement and approval of the proposed amendments by the Internal Revenue Service and the Pension Benefit Guarantee Corporation, counsel for the class will apply to the court for a determination of reasonable counsel fees and disbursements. The amount of fees fixed by the court will be paid by A & P from the remaining surplus, not out of the $50,000,000 settlement fund.

### Plaintiff's Objections

Mr. Walsh objects to the "40/10 split" in the $50 million dollar settlement and to the refusal of A & P to guarantee a specific percentage increase in benefits. To quote Mr. Walsh, "I say that any settlement in

this case should be the simplest of settlements, it should say each and every member of the class shall get an increase of X percentage period. Without discrimination. This is no place for COLAs (Cost of Living Adjustments), this is no place for any other garbage." Transcript of June 1, 1982, Hearing at B–18.

However, A & P counsel represented that the 40/10 split reflected the fact that approximately 80% of the class members were "inactive" or retired A & P employees while 20% of the class members were "active" A & P employees. Furthermore, class counsel represented that, while A & P would not guarantee a specific percentage increase, counsel had satisfied themselves that the proposed $50 million would in the foreseeable future purchase at least a 15% increase in benefits. Although Mr. Walsh objects to the distribution of any residual within the class of retired A & P employees, A & P counsel explained that more money would be distributed to those class members retired for a longer period of time because their pensions had not kept pace with inflation since their retirement, and it was fair that they receive a greater portion from the settlement. See Transcript of June 1, 1982, Hearing at B–20. The court concludes the 40/10 split and the formula for allocating any residual is entirely reasonable, given the composition of the class.

The court has carefully considered plaintiff's objections to the proposed settlement. These have, for the most part, taken two forms. The first form of objection is to the terms of the settlement. Plaintiff objects to the settlement because of the 40/10 split in the settlement fund and because the proposed settlement does not guarantee a specific percentage increase. The court concludes that the explanation of class counsel and of A & P's counsel, detailed above, supports the fairness of the settlement proposed here. It has not always been clear to the court what plaintiff would regard as a fair settlement. At the June 1, 1982, hearing it appeared that, but for the 40/10 split, plaintiff would have approved of a settlement which guaranteed a 15% increase in benefits to plan participants. In fact, plaintiff stated, "Any settlement should be 15 percent to each and every member of this plan . . . ." Transcript of June 1, 1982, Hearing at B–17. Materials submitted by plaintiff at the time of the hearing indicated plaintiff would have regarded the proposed settlement as fair only if it provided a 20% increase for members retired more than 10 years, and 15% for members retired less than 10 years. See Letter of William I. Walsh, dated April 8, 1982. At other times, plaintiff appeared to require an increase of 25% for members retired more than 7 years, with a 20% increase for members retired less than 7 years. See Letter of William I. Walsh, dated March 31, 1982. In a document captioned "Final Proposal—Stipulation of Settlement," plaintiff demands an increase of 20% for all retired members. See Letter of William I. Walsh, dated May 13, 1982. Finally, at the September 21, 1982, hearing on the fairness of the proposed settlement, plaintiff stated that a fair settlement would be to "split [the excess assets] right down the middle. And maybe one dollar over 50 percent should go to the members." Transcript of September 21, 1982, Hearing at 58.

The second form of the plaintiff's objections to the proposed settlement deals with his legal arguments concerning plaintiff's chances of success. These arguments tend to focus on one aspect of the case—that the 1973 amendment to the plan constituted a binding, unalterable commitment on A & P's part to pay the excess assets to participants, and that this represents a plan liability to participants prior to termination. As the court has explained in detail, this argument is not likely to prevail.

It must be emphasized that there is a significant risk that, after a protracted and expensive litigation, plaintiff and the class would obtain nothing, given the low probability of success of his attempt to compel termination of the plan and distribution of the excess assets to participants. Plaintiff misunderstands the consequences of a rejection of the proposed settlement. He ap-

pears to be of the opinion that, because A & P has offered $50 million in settlement, A & P would respond to a rejection of the proposed settlement with a substantially more generous settlement offer. Yet this is by no means certain. Another alternative open to A & P would be to litigate this case to a conclusion. If A & P were to prevail, plaintiff and the class would receive nothing. Additionally, even if A & P were enjoined from terminating the plan and capturing the excess assets, unless plaintiff obtained mandatory injunctive relief terminating the plan and distributing the excess assets to the participants, or directing increases in pension benefits, his victory in preventing A & P's termination would be virtually meaningless.

## Conclusion

The court has weighed the proposed settlement terms against the foregoing background. The settlement provides an increase in pension benefits of up to 15% for retired class members, as well as $10 million worth of increased benefits for active members. As noted, many class members are of an advanced age and perhaps would not share in the benefits of a litigated class victory.

In considering the overall fairness of the settlement terms in light of the small likelihood of plaintiff's success, the court has given weight to the analysis of the court-appointed actuary, Mr. Kleinberg. For example, Mr. Kleinberg approached the issue of the reasonableness of the settlement, in his expert opinion, from the perspective of possible alternatives. *See* Comments at 6–7. His first alternative has the plan being terminated, the surplus allocated to participants, and A & P not instituting a new plan for active employees, and corresponds to that which might occur if plaintiff totally prevailed. Under the second alternative, settlement terms are compared to a situation where the existing plan continues, surplus is not distributed to either A & P or the participants, and no new plan is installed. This latter scenario would occur if plaintiff succeeded in enjoining termination by A & P, but was unable to compel distribution of excess assets to participants.

Mr. Kleinberg states that, under the first alternative, "the older, longer service and most highly paid employees will do better than under the proposed settlement." Comments at 7. Mr. Kleinberg states that existing retirees would receive a greater increase than is provided under the proposed settlement. "However, younger employees, and especially those employees who are not highly paid, will fare better under the proposed settlement than under Alternative A." *Id.* This is because the proposed settlement includes a new defined contribution pension plan, and this type of plan allocates a greater proportion of the sponsor's contribution to younger, lower paid employees.

Under the second alternative, according to Mr. Kleinberg, participants very close to retirement would do better under the proposed settlement, and younger, lower paid participants would accrue better benefits under the proposed settlement. Mr. Kleinberg indicates that, of the class members, only older and higher salaried participants who are not very close to retirement would do better under the second alternative than under the proposed settlement.

Given the court's belief that plaintiff has a very small likelihood of success in compelling termination, the court finds Mr. Kleinberg's comments regarding the second alternative to be very significant on the question of the reasonableness of the settlement. As between the choice of the proposed settlement and continuation of the current plan, Mr. Kleinberg concludes:

> Most but not all employees, pensioners and beneficiaries would be better off under the proposed settlement, even without consideration of the effect of $150 million in new capital on A & P's operations and the employment prospects of Plan participants.

Comments at 9. Accordingly, this court accords significant weight to the conclusion of its court-appointed independent expert, Mr. Kleinberg, that "unless there is a reasonable chance for the class to (1) prevent the recoupment of surplus *and* (2) force the plan termination and allocation of surplus, there is no reason to not support the proposed settlement." *Id.*

658

The court has concluded that there is not a reasonable chance for the class to force the termination of the plan. Its review of the proposed settlement and of the expert's comments leads it to conclude that, in light of the low likelihood of success, the proposed settlement is fair, reasonable and adequate. This court has accorded the named plaintiff's views the additional weight to which they are entitled by virtue of his status as class representative. With respect to his view of the fairness of the settlement terms, however, it is not dissuaded from its view that, in light of the small likelihood of success, this is a fair, reasonable and adequate settlement. However, this court will retain jurisdiction of the matter pending approval of the termination by the IRS and PBGC, upon which this settlement is conditioned. The court will order that, if the IRS determines that "partial terminations" have occurred, A & P shall provide from that portion of the excess assets which it obtains as a result of this settlement sufficient funds to pay any newly-vested benefits to these terminees, and increased benefits equal to those provided class members under the settlement.

