Francis VAN ORMAN, on his own behalf and on behalf of all participants and beneficiaries similarly situated, Plaintiff,

v.

The AMERICAN INSURANCE COMPANY, et al., Defendants.

Nellie TAYLOR and Andrew Marsh, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

FIREMAN'S FUND INSURANCE COMPANY, et al., Defendants.

Civ. A. Nos. 75–2007, 76–2287 and 75CV14–W–L.

United States District Court, D. New Jersey.

March 26, 1984.

Meyner and Landis by Edwin C. Landis, Jr., Jeffrey L. Reiner, Richard L. Schaplowsky, Newark, N.J. and Watson, Ess, Marshall & Enggas by Allan L. Bioff, Paul R. Lamoree (Missouri Bar), Kansas City, Mo., for plaintiffs.

Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney by Albert G. Besser, Irvin M. Freilich, Newark, N.J. and Orrick, Herrington & Sutcliffe by Cameron W. Wolfe, Jr., Norman C. Hile (California Bar), San Francisco, Cal., for defendants.

## OPINION

DEBEVOISE, District Judge.

A number of motions are pending in this action. Critical to the ultimate resolution of this controversy are the parties' cross-motions for summary judgment testing the validity of the reactivation of The American Retirement Plan ("TARP"). These summary judgment motions will be dealt with first.

### I. *Background*

A. *Facts and History of the Litigation:* The history of this litigation and a recital of the facts which give rise to it are set forth in the opinion of the Hon. H. Curtis Meanor, filed October 27, 1980, as supplemented by an opinion filed February 18, 1981 and in an opinion of the Court of Appeals, *Van Orman v. American Ins. Co.*, 680 F.2d 301 (3d Cir.1982). Certain of these facts must be repeated here, and events which have taken place since the filing of these opinions must be described.

TARP was established in 1957 by The American Insurance Company for eligible employees of American and two of its subsidiaries, the American Automobile Company and the Associated Indemnity Corporation (the "Affiliated Companies"). The plan was a defined benefit plan funded by contributions from both employees and employers. Participants contributed a fixed

percentage of their salaries, and the employer paid the remaining cost of the Plan in such amounts as "necessary on the basis of actuarial calculations to carry out the purposes" of TARP.

In 1963 Fireman's Fund Insurance Co. acquired the Affiliated Companies. To provide a uniform pension plan for all its employees, Fireman's Fund made the Affiliated Companies' employees eligible to participate in the Fireman's Fund Retirement Plan ("FARP"), which was funded entirely by employer contributions. Simultaneously TARP was amended so that no further benefits accrued and so that no further contributions were made by either the employer or the employees after May 31, 1964. It was computed that on that date, as a result of "freezing" the fund, the market value of the fund's actuarial surplus exceeded $3 million.

When the employees of the Affiliated Companies were transferred into FARP, they became eligible for the generally higher FARP benefits, which were paid for entirely by Fireman's Fund. Between 1964 and 1979 the FARP benefit provisions were improved from time to time.

By 1975 the surplus in TARP was estimated to be $12 million. Fireman's Fund notified employees who participated in TARP that it had tentatively decided to terminate TARP on December 11, 1975 and purchase a group annuity contract to provide for their retirement benefits. Section 9.3 of TARP provides:

> Notwithstanding any provisions of this Plan to the contrary, upon termination of the Plan, but only after all liabilities under the Plan shall have been satisfied, the Affiliated Companies shall be entitled to any balance of the net assets of the Trust Fund which shall remain by reason of erroneous actuarial computation during the life of the Plan.

Fireman's Fund advised the TARP participants that, pursuant to Section 9.3, the Affiliated Companies intended to retain the surplus. Several employees objected to the termination and the Affiliated Companies' appropriation of the surplus, claiming that the booklets and letters describing TARP which had been distributed to them between 1957 and 1963 established their right to the TARP surplus upon termination. This litigation ensued.

It is unnecessary to describe the procedural developments which led to the present alignment of the parties. It is sufficient to note that plaintiff class consists generally of retired and former employees of the Affiliated Companies. Defendants are Fireman's Fund, the Affiliated Companies, Fireman's Fund American Life Insurance Company ("FFALIC"), TARP, FARP and two members of the Employee Benefit Administration Committee of Fireman's Fund. Plaintiffs' Complaint (the "complaint") asserted claims under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1381, state contract law, and under federal and state securities laws.

It is apparent that after this litigation had been underway for some years defendants suffered doubts about the right of the Affiliated Companies to acquire TARP's surplus upon termination of TARP. In consequence Fireman's Fund "reactivated" TARP as of January 1, 1979. TARP was amended to provide that all TARP participants would be retransferred into the plan from FARP, that no further FARP benefits would accrue to these employees after December 31, 1978, and that the retransferred participants would accrue benefits under TARP beginning January 1, 1979. The employees who were thus transferred continued to have the same benefits they had had when they were covered by FARP. Fireman's Fund no longer had to pay into FARP to fund those benefits. Instead it expected to look to the TARP surplus, saving itself very substantial annual pension fund payments. Fireman's Fund applied to the IRS and received a determination that the reactivated TARP would be a qualified plan under the Internal Revenue Code.

Plaintiff class moved to enjoin defendants from reactivating TARP. This court denied the motion, but required defendants to post a surety bond to cover any funds

withdrawn from TARP as a result of reactivation.

B. *Prior Motions and Appeal:* In 1980 earlier cross-motions of plaintiffs and defendants for partial summary judgment were heard, resulting in Judge Meanor's October 27, 1980 opinion. In order to understand the scope of the issues which remain in the case, it is necessary to review briefly the matters disposed of in that opinion and in the opinion of the Court of Appeals on the resulting interlocutory appeal.

Count II of plaintiffs' complaint claimed that the TARP document included the booklets and letters distributed to employees and that these booklets and letters provided that the employees were entitled to any surplus which existed upon TARP's termination. Judge Meanor ruled that the provisions of TARP constituted the contract and that those provisions were not modified by the booklets and letters. He further ruled that the provisions of Section 9.3 of TARP permitting the employers to recapture on termination surplus due to erroneous actuarial computation is permitted by the applicable statute and regulations. ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1); Treas.Reg. § 1.401–2(b)(1). However, he held that recapture is limited to the amount attributable to employer contributions. Judge Meanor summarized his conclusions about Count II as follows:

> ... I hold that the TARP contract was the TARP document and does not include the booklets and letters cited by plaintiffs. I hold that § 9.3 is validly included within TARP. However, as a matter of law, the right of recapture given therein to the employer cannot extend to surplus sums attributable to employee contributions. Finally, there remains a genuine issue of material fact as to whether the remainder of the "surplus" is attributable in whole or in part to erroneous actuarial computations, made during the life of TARP.

Slip Op. at 30.

This part of the opinion was implemented by paragraphs 2 and 3 of an August 25, 1981 Order on Motions for Partial Summary Judgment. These paragraphs denied both the plaintiffs' and defendants' motions for summary judgment on Count II. The Court of Appeals affirmed this part of the Order.

Plaintiffs and defendants both moved for summary judgment on Count III of the complaint which alleged that Section 4044 of ERISA 29 U.S.C. § 1344, governs the distribution of TARP. Section 4044 concerns allocation of assets on "termination of a defined benefit plan." Subsection (d)(2) of Section 4044 requires that "after all liabilities of the plan have been satisfied" any residual assets must be "equitably distributed to the employees who made such contributions ... in accordance with their rate of contributions." Judge Meanor noted that plaintiffs had requested as one form of relief a judicially-ordered termination of TARP and held "that § 4044(d) would apply in the event that this relief is granted." He denied defendants' motion for summary judgment declaring Section 4044 inapplicable on a judicial termination of TARP; conversely he granted plaintiffs' application for summary judgment declaring the applicability of Section 4044 in the event of a judicial termination of TARP and that on termination plaintiffs are entitled to surplus funds attributable to employee contributions. These rulings were implemented in paragraphs 4 and 5 of the August 25, 1981 Order.

The Count III rulings were not the subject of the interlocutory appeal, but it is clear that the Court of Appeals agreed with Judge Meanor's conclusions in this regard. In its discussion of Count II it stated:

> We agree that the regulation permitting employers to recapture surplus caused by erroneous actuarial computation must be limited by the provisions of section 4044(d). To hold otherwise would nullify an express statutory intent that the portion of the surplus attributable to employee contributions be distributed to employees upon termination.

680 F.2d 301, 307–308.

In Count IV plaintiffs, relying on New Jersey's law of reasonable expectations,

claimed that even if the booklets and letters did not constitute a part of the TARP documents, the language contained in them should nevertheless prevail over contradictory terms of the contract. Judge Meanor ruled that even on this theory the plan provisions should prevail over the language in the booklets and letters.

Paragraph 7 of the August 25, 1981 Order denied plaintiffs' motion for summary judgment in Count IV. However paragraph 8 denied defendants' motion for summary judgment in that Count since "there is a genuine issue of material fact as to whether defendant can establish that the 'surplus' resulting from employer contributions, or any part thereof, is attributable to erroneous actuarial computations during the life of the plan." On appeal the Court stated that "we do not believe that the district court improperly applied the reasonable expectations doctrine."

In Count V plaintiffs sought recovery of the TARP surplus on the basis of a *quantum meruit* theory arising out of their "continued employment by defendant." Paragraph 9 of the August 25, 1981 Order implemented Judge Meanor's award of summary judgment in favor of defendants on that Count. This was not a subject of the interlocutory appeal.

In Count VI plaintiffs sought recovery of the TARP surplus on an unjust enrichment theory, claiming that "transfer of TARP funds to FARP or any other application of [TARP] other than for the sole and exclusive ... benefit of the class will result in the unjust enrichment of the ... companies making contributions to FARP, to the detriment of plaintiffs." Concerning the question of "enrichment", Judge Meanor observed:

Thus, in whatever form proposed by defendants (termination, merger, reactivation), Fireman's Fund would reap benefits which exceed employer contributions to TARP, either by way of income, by reducing Fireman's Fund contributions to FARP or by paying newly-accrued benefits in TARP without further employer contributions. In any form, Fireman's Fund would be "enriched" by recovery of the TARP surplus.

Slip Op. at 44–45.

Turning to the question whether the enrichment was "unjust", Judge Meanor observed:

Elsewhere I have held that § 4044(d)(2) of ERISA mandates that, upon TARP's termination, surplus funds attributable to employee contributions must be distributed to the plan's beneficiaries. Alternatively, I believe the above considerations require me to conclude that retention of surplus funds attributable to employee contributions would result in the unjust enrichment of defendants.

Thus, with respect to TARP funds attributable to employee contributions plaintiffs' motion for summary judgment will be granted and defendants' denied. This holding extends to any transfer of TARP assets to FARP, since the beneficiaries of the two plans are not coextensive. Defendants have been aware, since 1964, that TARP was in a surplus position. It would, in my estimation, unjustly enrich defendants to permit transfer of TARP surplus attributable to employee contributions for the benefit of FARP participants and to reduce defendants' contractual obligation to fund FARP.

For similar reasons, I believe that use of surplus attributable to employee contributions to fund additional liabilities in a reactivated TARP is impermissible on unjust enrichment grounds. These obligations would have otherwise required contributions to FARP. Only a small percentage of TARP participants would accrue new benefits thereby benefiting from the TARP surplus. In effect, funds generated by employee contributions from 1957 to 1964 are being used to reduce Fireman's Fund's liability to FARP. I believe this use of funds to be impermissible on unjust enrichment grounds.

Different considerations pertain to the surplus funds attributable to employer contributions. Although the statutes and regulations clearly require pension

funds to be held for the exclusive benefit of the plan's beneficiaries, the regulations also permit the employer to include a plan provision, such as § 9.3, permitting recapture in certain defined circumstances. Implicit in these regulations is the determination that employer recovery in such circumstances does not violate the spirit of the "exclusive benefit" rule and would not be equitable. *See* ERISA § 4044(d)(1). 29 U.S.C. § 1344(d)(1); Treas.Reg. § 1.401–2(b). In discussion of Count II, I have determined that there is a factual issue as to whether the conditions prescribed in the statute and regulations have been met. Additionally, the New Jersey courts have indicated that unjust enrichment theory is inapplicable to a noncontributory pension plan. *See Crinnion v. The Great Atl. & Pac. Tea Co.*, 156 N.J.Super. 479, 485 [384 A.2d 159] (App.Div.1978). Assuming the factual prerequisites of the statute and regulations are met, I believe *Crinnion* provides a persuasive analogy concerning applicability of unjust enrichment theory to the employer portion of the TARP surplus. I believe, however, that the presence of the factual issue set forth in discussion of Count II, *supra,* mandates that both plaintiffs' and defendants' motions for summary judgment be denied with respect to TARP surplus funds attributable to employer contributions.

Slip Op. at 48–50.

Judge Meanor's rulings on Count VI were reflected in paragraphs 10–12 of the August 25, 1981 Order:

(10) that with respect to the funds in TARP attributable to employee contributions, plaintiffs' motion for summary judgment on Count VI of the Second Amended Consolidated Complaint is granted and defendants' motion for summary judgment is denied;

(11) that the use of surplus funds attributable to employee contributions to fund additional liabilities in a reactivated TARP is impermissible on unjust enrichment grounds;

(12) that there exist genuine issues of material fact as to the surplus attributable to employer contributions and, therefore, both plaintiffs' and defendants' motions for summary judgment on Count VI of the Second Amended Consolidated Complaint as to the surplus funds in TARP attributable to employer contributions are denied;

This portion of the Order was a subject of the interlocutory appeal. The Court of Appeals held that the doctrine of unjust enrichment is inapplicable under New Jersey law when, as here, a valid, unrescinded contract governs the rights of the parties.

The Court of Appeals stated that "[i]t is clear that Congress intended federal courts to fashion a federal common law concerning pension plans under ERISA" and that "[w]e thus must determine whether employees have a right, based on a federal common law doctrine of unjust enrichment emanating from ERISA, to any portion of the surplus." 680 F.2d at 311. Noting the extensive regulatory network which Congress established in ERISA, the Court stated:

We are particularly reluctant to fashion a federal common-law doctrine of unjust enrichment when such a right would override a contractual provision. The district court found that section 9.3 of the TARP document, as modified by section 4044(d)(2) of ERISA, governed the distribution of the surplus upon termination. The contract does not afford plaintiffs any pre-termination right to the surplus and, in fact, expressly states that employees have no rights to the fund other than those provided in the contract. The existence of a contract, in our view, requires a particularly strong indication that the unjust enrichment doctrine will vindicate an important statutory policy.

680 F.2d at 312.

The Court of Appeals held that with respect to the employees' entitlement to a portion of the surplus on termination, the unjust enrichment remedy "is entirely duplicative of employees' statutory rights" under Section 4044(d)(2) of ERISA and Sec-

tion 9.3 of the TARP contract, stating, "In light of the express statutory and contractual entitlement to the surplus, we see little reason for the creation of this right as a matter of federal common law and therefore, will reverse the district court's ruling." 680 F.2d at 313.

The Court of Appeals also held that it was error to apply an unjust enrichment doctrine in determining the lawfulness of the use of the surplus to fund newly accruing benefits in the reactivated TARP. The Court noted that Congress apparently enacted Section 4044(d)(2) governing distributions on termination because of equitable considerations, but then observed that "[w]e perceive nothing in the legislative history of ERISA, however, that indicates that Congress believed the same 'equitable principles' apply *before* a plan has been terminated." 680 F.2d at 313. The Court concluded that pre-termination use of all of TARP's assets, whether surplus or not, must be governed by the statutory provisions prescribing minimum standards of fiduciary conduct, such as 29 U.S.C. §§ 1103–06.

Counts VII and VIII of the complaint stated claims generally arising under federal and state securities laws. Holding that plaintiffs' interests in TARP were not "securities" within the meaning of these acts, Judge Meanor granted summary judgment in defendants' favor on these Counts. This determination was incorporated in paragraphs 13 and 14 of the August 25, 1981 Order and was not a subject of the interlocutory appeal.

Plaintiffs also moved before Judge Meanor for summary judgment declaring that certain items are properly includable in TARP, increasing the actuarial surplus subject to plaintiffs' claims. Their motion was granted as to certain items (as set forth in paragraph 15a–e of the August 25, 1981 Order) and in other respects was denied (as set forth in paragraph 16 of the Order) either on the merits or because factual questions remained.

The August 25, 1981 Order also incorporated other determinations contained in Judge Meanor's opinion, namely:

(17) that plaintiffs' motion for summary judgment declaring that there has, to date, been no legal merger or *de facto* merger of TARP and FARP be and hereby is granted;

(18) that plaintiffs' motion for summary judgment declaring that they are entitled to punitive damages be and hereby is denied;

(19) that defendants' motion for summary judgment declaring that TARP has not been terminated to date be and hereby is granted;

(20) that plaintiffs' motion for summary judgment directing termination of TARP be and hereby is denied;

(21) that defendants' be and hereby are ordered to exercise their fiduciary discretion within thirty (30) days from the entry of this order and decide whether, by amendment or otherwise, an increase in TARP benefits is appropriate;

(22) that defendants' counsel is to notify the court and plaintiffs' counsel of their decision made pursuant to paragraph (21), *supra*, within five (5) days thereof;

(23) that plaintiffs' motion for appointment of a successor trustee be and hereby is denied;

(24) that plaintiffs' motion for summary judgment declaring that the 1964 "freeze" of TARP was an event requiring accelerated vesting on behalf of all TARP participants be and hereby is denied;

(25) that defendants' motion to compel more particularized pleadings with regard to Counts IX, X and XI of the Second Amended Consolidated Complaint be and hereby is denied and defendants are required to answer the Second Amended Consolidated Complaint within twenty (20) days from the entry of this order;

(26) that plaintiffs' motion for reconsideration of the Court's denial of preliminary injunctive relief enjoining and re-

straining defendants from reactivating TARP be and hereby is denied on the condition that defendants provide a Fireman's Fund Insurance Company surety bond to cover any funds withdrawn from TARP consequent to the reactivation of TARP.

None of the determinations concerning items of surplus and none of the determinations reflected in the portions of the Order quoted above were a subject of the interlocutory appeal except that defendants sought to appeal paragraph 21 requiring them to exercise their fiduciary discretion within 30 days of entry of the Order and decide whether, by amendment or otherwise, an increase in TARP benefits is appropriate. The Court of Appeals dismissed this appeal for want of jurisdiction.

In sum the Court of Appeals reversed the district court's order granting in part plaintiffs' motion for summary judgment on the Count VI unjust enrichment claim and affirmed the other rulings certified for interlocutory appeal, namely (i) denial of plaintiffs' motion on Count IV of the Second Amended Consolidated Complaint, (ii) denial of defendants' motion for summary judgment on Count II, and (iii) denial of defendants' motion for summary judgment on Count VI.

C. *Status of the Pleadings:* Before turning to the pending motions, it might be useful to summarize the status of plaintiffs' claims and defendants' counterclaims in light of the district court and Court of Appeals decisions.

Count I of the complaint charges that defendants' actions since 1964 and in particular the reactivation of TARP and continued use of the surplus violates defendants' fiduciary duties to plaintiffs. This Count was not a subject of the summary judgment motion or of the appeal.

Count II seeks recovery of the entire surplus in reliance on the TARP documents. The effect of prior motions is to deny that claim to the extent it relies on the booklets and letters distributed to employees, to deny the claim in the event of termination to the extent that the surplus results from employers contributions and is attributable to erroneous actuarial computations made during the life of TARP and to uphold the claim in the event of termination to the extent that the surplus is not attributable to employer contributions resulting from erroneous actuarial computations.

In Count III plaintiffs seek a judgment that Section 4044(d) of ERISA governs the distribution of TARP. The prior motions and the appeal establish that Section 4044(d) would apply in the event of a termination of TARP by judicial order or otherwise, and that under that section on termination plaintiffs would be entitled to surplus funds attributable to employee contributions.

Count IV sets forth a claim to the surplus based on the reasonable expectations raised by the booklets and letters. To the extent that plaintiffs rely on this doctrine Count IV does not assert a valid claim. As I understand both the district court and Court of Appeals decisions Count IV may state a claim to portions of surplus not resulting from erroneous actuarial computations. However, when Count IV is limited in that fashion, I do not believe it adds anything to the claims asserted in Count I and the remaining claims asserted in Count II.

Summary judgment in favor of defendants has been awarded on Count V which advances a *quantum meruit* theory.

Count VI advances the unjust enrichment theory which was rejected by the Court of Appeals both as it applies to the disposition of surplus on termination and as it applies to the use of surplus to fund newly accruing benefits in the reactivated TARP. Nothing remains of Count VI. The disposition of surplus on termination is covered by the remaining claims advanced in Count II and by the claims advanced in Count III. The propriety of the use of surplus in reactivated TARP is covered by the claims based on fiduciary obligations advanced in Count I.

Summary judgment in favor of the defendants has been entered on Counts VII and VIII which rely on federal and state securities laws.

Counts IX through XII allege various improper payments or diversions of TARP funds, self-dealing between FFALIC, TARP and FARP, improper accumulation of assets in TARP, and a violation of defendants' fiduciary duties by giving only "voluntary" cost-of-living benefit increases to TARP members while amending FARP to provide such benefit increases to its members. Certain of the issues raised by these counts were resolved in Judge Meanor's opinion, as supplemented. Certain of these issues remain to be resolved.

Count XIII simply seeks declaratory relief pursuant to 28 U.S.C. § 2201.

Defendants answered the Second Amended Consolidated Complaint after Judge Meanor's opinion was filed and before the Court of Appeals filed its opinion. A counterclaim accompanied the answer.

The First Count of the Counterclaim sought a judgment declaring that TARP was merged into FARP and that the amount of TARP funds over and above that amount which is necessary to fund the original liabilities of TARP may be applied in reduction of future employer contributions for all participants of the merged plan. It would appear that Judge Meanor's opinion and paragraph 17 of the August 25, 1981 Order implementing his opinion have resolved the claim asserted in the First Count of the counterclaim adversely to defendants.

The Second Count of the Counterclaim recites the facts leading to the reactivation of TARP. It asks for a judgment declaring that the reactivation of TARP by way of amendments of both TARP and FARP effective January 1, 1979 was permissible,

that defendants may continue to use all of the TARP assets to fund all retirement benefits under the TARP plan, and that any funds in TARP may be utilized to satisfy the present liabilities of TARP. The Second Count is the subject of the pending cross-motions for summary judgment.

The Third Count alleges that if the court determines that FARP and TARP were not in fact merged and that the reactivation of TARP was impermissible, the Affiliated Companies and Fireman's Fund intend to merge TARP and FARP into a single plan. Judgment is sought declaring that upon such merger and after satisfaction of all liabilities accrued under TARP by the purchase of annuities, any remaining TARP funds may be applied in reduction of future employer contributions for all participants in the merged plan.

## II. *Cross-Motions for Summary Judgment*

Plaintiffs moved (i) for summary judgment in their favor on the Second Count of defendants' counterclaim, (ii) for an order declaring that any reactivation of TARP which allows for the use of the employee-contributed and/or non-erroneous actuarial computation portion of the surplus to fund newly-accruing benefits for the participants in any such reactivated TARP is unlawful and (iii) for an order declaring that TARP is to be terminated on a date certain. Defendants moved for summary judgment in their favor on the Second Count of their counterclaim. The effect of these two motions is to put in issue the lawfulness of reactivated TARP.

A. *Application of Fiduciary Principles:* The Court of Appeals designated the criteria by which reactivation of TARP is to be judged, namely, whether reactivation comports with the minimum standards of fiduciary conduct imposed by ERISA.[1]

---

1. The National Office of the Internal Revenue Service has determined in a Technical Advice Memorandum that the 1979 reactivation of TARP does not violate Section 401(a) of the Internal Revenue Code. That Section deals with the qualification of pension plans for certain tax benefits, and one of its requirements is that the plan be operated for the exclusive benefit of participants. While the IRS memorandum is of interest, it was decided in the context of tax issues and is by no means dispositive of the question whether defendants' dealings with TARP complies with their fiduciary obligations.

Plaintiffs urged that reactivation falls below that standard and violates ERISA's Sections 403(c)(1), 406(a)(1)(D), 406(b)(1) and (2), 29 U.S.C. §§ 1103(c)(1), 1106(a)(1)(D), 1106(b)(1) and (2).[2] These provisions generally require that with certain exceptions (including employer recapture on termination) the assets of a plan shall never inure to the benefit of an employer and shall be held for the exclusive benefit of the participants and to defray administrative expenses and that a fiduciary shall not deal with the assets of a plan in his own interest or act in any transaction involving the plan on behalf of a party whose interests are adverse to the interests of the plan or its participants.

Plaintiffs charge that from the freezing of TARP in 1964 through reactivation of TARP in 1979 and until the present moment defendants' management of TARP has been in the defendants' interests and contrary to the interests of the participants. Defendants' sole interest, according to plaintiffs, has been to obtain the benefits of the actuarial surplus and to prevent distribution of any of the surplus to plaintiffs. This was first attempted through the proposed 1975 termination. It became apparent, as described above, that on termination an employer cannot recapture surplus attributable to employee contributions and can only recapture other surplus to the extent it arises from erroneous actuarial computations.

Next defendants sought to obtain the benefit of the surplus by advancing a

TARP–FARP merger theory which Judge Meanor rejected. Finally defendants reactivated TARP. TARP will become responsible for its former participants who are still employees of defendants (approximately 400 persons) and it will remain responsible for the benefits payable to retired TARP participants (approximately 1300 persons). In view of TARP's actuarial surplus it will be unnecessary for defendants to make any payments to TARP on account of the accruing benefits of the 400 employees transferred from FARP, and defendants will no longer have to make payments on their account to FARP. Thus, plaintiffs argue, defendants are indirectly acquiring the TARP surplus much of which, it must be assumed, is attributable to employee contributions.

Plaintiffs urge that defendants have a fiduciary obligation to proceed in such a way that plaintiffs will receive the benefit at least of that portion of surplus which is attributable to employee contributions. This could be done either by increasing TARP benefits to a point where the actuarial surplus will disappear or else by terminating TARP. If TARP were terminated defendants would be entitled to that portion of the surplus contributed by the employer and attributable to erroneous actuarial computations. The balance would be available for distribution to the participants. By simply reactivating rather than increasing benefits dramatically or terminating TARP defendants, according to

2. Section 403(c)(1) provides:

　(1) Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Section 406(a)(1)(D) provides:

　(a) Except as provided in section 1108 of this title:

　(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

　(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or

Section 406(b)(1) and (2) provides:

　(b) A fiduciary with respect to a plan shall not—

　(1) deal with the assets of the plan in his own interest or for his own account,

　(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

plaintiffs, have given preference to their own interests and sacrificed the interests of TARP's beneficiaries.

At first blush plaintiffs' argument has a superficial appeal. However, I have concluded that the course which defendants have pursued in reactivating TARP does not constitute a violation of their fiduciary obligations.

There can be no question that upon reactivation all TARP assets were being devoted exclusively to paying TARP participants defined pension benefits. The participants received and would continue to receive all the benefits which the plan is responsible to provide. None of the assets will be paid to or for the benefit of the defendants. For the purposes of the present motions it will be assumed that TARP enjoys a substantial actuarial surplus resulting from overpayments by the employers in the past and from good investment performance with respect to TARP assets contributed by both employer and employees. For the purposes of the present motions it will also be assumed that this surplus will be augmented by repayments to TARP of funds which Judge Meanor concluded should be reimbursed and perhaps by other funds which I conclude should be reimbursed.

It is impossible to predict whether benefits will be increased, whether investment of fund assets will be successful or unsuccessful in the future. If what transpires results in a surplus at the time of termination when TARP has no active employee-participants accruing benefits, the surplus will, as in the case of any pension fund, be distributed in accordance with ERISA's mandates. Only as permitted by ERISA and the provisions of TARP will any of the surplus be recaptured by defendants.

In the case of pension plans there are two kinds of decisions which an employer must make. There are those concerning the assets of the pension fund which have been paid over or received from investments. An employer, of course, must deal with these assets exercising the highest degree of fiduciary care. Acting in accordance with self-interest in that area

would be totally improper. These are the kinds of decisions to which reference is made in Sections 403(c)(1), 406(a)(1)(D) and 406(b)(1) and (2) of ERISA. Given this obligation with respect to the fund itself, there are other areas of decision making where an employer can, subject to specific requirements of ERISA, consider its own interests and exercise its business judgment. Examples of this kind of decision are (i) creating or not creating the plan in the first instance, (ii) increasing or not increasing benefits, (iii) terminating or not terminating a plan.

*In re C.D. Moyer Co. Trust Fund,* 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd without opinion,* 582 F.2d 1273 (3d Cir.1978) is an example of the exercise of business judgment in an area where it was appropriate to do so. There a pension plan agreement permitted amendment provided that "[i]t shall ... be impossible, if any ... amendment ... be made pursuant to this provision, for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries." In January 1976, there was a surplus, and had the plan been terminated, all the surplus would have been paid to the employees.

In March the employer amended the plan to provide for payment to it of any assets which remained in the plan because of erroneous actuarial computations after the plan satisfied all liabilities. In April 1976 the employer proposed termination of the plan seeking distribution to itself of the $90,000 surplus remaining after the purchase of annuities for all participants. As in the present case, the employer's decisions were motivated by its own interests. Yet the court in *Moyer* found no violation of ERISA because of that fact. There was no improper dealing with fund assets; the actions which the employer took were in accordance with the provisions of ERISA. To the same effect is *Esteves v. G.A.F. Corporation,* Civil Action No. 82–4226 (D.N.J. Aug. 31, 1983) (holding specifically that amending a plan to enable an employ-

er to receive available surplus on termination did not violate fiduciary duties created by ERISA); *cf. Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513 (4th Cir.1980) (Plan providing for distribution of surplus to beneficiaries may not be amended *after* termination to provide for distribution to employer).

A sponsor's right to exercise its business judgment in creation, suspension and termination was implicitly confirmed in a recent decision of the Honorable Frederick B. Lacey in *Walsh v. The Great Atlantic & Pacific Tea Company, Inc.*, 96 F.R.D. 632 (D.N.J.1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983). The issue there was whether to approve a settlement in a class action in which the class sought to establish its entitlement to a $250 million actuarial surplus in the A & P plan. In determining to approve a settlement under which the plaintiff class would receive only $50 million, with the remainder of the surplus going to the company, Judge Lacey examined the relief sought by plaintiff—an order compelling A & P to terminate the plan and distribute the excess assets to the participants, or, alternatively, an order requiring A & P to employ the excess assets to increase the pension benefits of plan participants.

In this context, regarding the use of surplus funds in an ongoing plan, Judge Lacey said:

> It is undisputed that, prior to this lawsuit, the plan fund was "overfunded" in the sense that, if termination were to have occurred, excess assets would have remained after satisfying liabilities created by the "Benefits" section of the plan. Yet, A & P employed such excess assets in a variety of ways, such as by eliminating or reducing its contributions to the fund or by extending benefits or coverage. This was done without protest from any of the participants; none claimed a right to any part of such "excess." *If A & P was enjoined from terminating its plan, it could do what it has threatened to do should this proposed settlement be rejected: simply revert to its prior policies, including the suspension of contributions, and thus gradually eliminate the excess assets.* Thus, plaintiff faces the prospect that, after a long and expensive fight, even if he should prevail in enjoining A & P's contemplated course of action, his victory would be a hollow one.

96 F.R.D. at 650. (Emphasis added).

Judge Lacey recognized that the employer could have "simply" employed the surplus assets to suspend its contributions, which is what Fireman's Fund is doing in the reactivated TARP—employing the surplus funds in the plan to pay plaintiffs' accrued benefits. While Fireman's Fund may "benefit" from such a use of the surplus, as Judge Lacey found, such a benefit is entirely consistent with the policies of ERISA.

As to the participants' attempt to acquire the surplus through the court ordered termination, Judge Lacey quoted with approval a court appointed expert's report which stated that a judicial determination that defendants breached their fiduciary duties by amending the subject plan so as to allow a reversion to the company of the plan's residual assets would prevent:

> plan trustees and sponsors from ever terminating, or *freezing plans*, or from cutting back on future accruals of benefits. I know of no such interpretation of the fiduciary rules of ERISA, and I believe such a provision would have a negative effect on the installation of new plans, the improvement of old plans, and the proper funding of all plans ... [I]t would be injurious of the security of pension plans in general to allow their members to compel distribution merely because of the existence of surplus.

96 F.R.D. at 650. (Emphasis added).

■ Thus *Moyer* and *Walsh* teach that a decision to terminate a plan so as to acquire a portion of a surplus is a non-fiduciary, business decision. Similarly I conclude that defendants' decision to reactivate TARP and to devote plan assets to paying accruing liabilities does not violate fiduciary obligations.

B. *Section 208 of ERISA:*[3] Plaintiffs next contend that reactivation of TARP violates Section 208 of ERISA, 29 U.S.C. § 1058, which reads in pertinent part:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated). * * *

Plaintiffs note that in 1979 on reactivation approximately 400 former TARP employees who in 1964 had been transferred to FARP, were transferred back to TARP. This, according to plaintiffs, resulted in TARP acquiring liabilities in the amount of $17 million on account of benefits to be paid to them. If a substantial portion of the TARP surplus resulted from employer contributions, this portion would necessarily be reduced by the assumption of the new liabilities. Consequently if the plan had been terminated on the transfer of liabilities each participant would not have received a benefit "which is equal to or greater than the benefit he would have been entitled to receive immediately before the ... transfer." It is plaintiffs' position, of course, that the "benefits" to which reference is made in Section 208 includes each participant's proportionate share of any actuarial surplus.

Defendants, on the other hand, contend that there has been no transfer of liabilities from FARP to TARP, and even if there were such a transfer within the meaning of the statute, plaintiffs' benefits before and after the transfer have not changed.

■ I conclude that defendants are correct in their position that no transfer of liabilities took place as a result of the reactivation. No FARP liabilities that had accrued to TARP participants while they were covered by FARP (during the period of TARP's freeze) were transferred to TARP as a result of the reactivation. Moreover, no FARP participants became TARP participants who had not previously been TARP participants. TARP assumed no existing liabilities of FARP; rather, TARP was reactivated in such a way as to allow only new liabilities to accrue in the future. This conclusion requires the further conclusion that 29 U.S.C. § 1058 is inapplicable to the reactivation of TARP.

■ Defendants argue persuasively that assuming, *arguendo*, that liabilities of FARP were transferred to TARP as a result of the 1979 reactivation and that, therefore, § 1058 is applicable, there was no diminution of "benefits" as defined by Section 414(*l*). The regulations under that section provide that the "benefits" that must be compared "on a termination basis" are "accrued benefits". I do not believe this includes entitlements to actuarial surpluses which may exist at any particular moment. The relevant part of the regulation provides:

If the sum of the assets of all plans is not less than the sum of the present values of the *accrued benefit* (whether

---

**3.** Sections 401(a)(12) and 414(*l*) of the Internal Revenue Code, 26 U.S.C. §§ 401(a)(12) and 414(*l*) contain virtually the same language as Section 208 of ERISA.

As a result of the ERISA Reorganization Plan, authority under Section 208 of ERISA has been transferred to the Secretary of the Treasury. *See* Section 101(a) of ERISA Reorganization Plan, ¶ 1928 of C.C.H. Pension Plan Guide, Vol. 1. As a consequence, all regulations implementing these provisions of law have been promulgated by the Secretary of the Treasury, mostly under Section 414(*l*) of the Internal Revenue Code. That Section provides in relevant part:

A trust which forms a part of a plan shall not constitute a qualified trust under section 401 ... unless in the case of any merger or consolidation of the plan with, or in the case of any transfer of assets or liabilities of such plan to, any other trust plan after September 2, 1974, each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if the plan had then terminated).

or not vested) of all plans, the requirements of section 414(1) will be satisfied merely by combining the assets and preserving each participant's accrued benefits. This is so because all the accrued benefits of the plan as merged are provided on a termination basis by the plan as merged. However, if the sum of the assets of all plans is less than the sum of the present values of the accrued benefits (whether or not vested) in all plans, the accrued benefits in the plan as merged are not provided on a termination basis.

Treas.Reg. § 1.414(1)–1(e)(1). (Emphasis added). The Internal Revenue Code defined "accrued benefit" as "the employee's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 26 U.S.C. § 411(a)(7)(A)(i).[4] Thus, an employee's hypothetical entitlement to an actuarial surplus is not an accrued benefit under the Code. TARP was in a surplus position following the reactivation, meaning that by definition TARP assets were not less than the sum of the present values of the accrued benefits.

■ Plaintiffs urge that the reference in Treas.Reg. § 1.414(1)–1(b)(5)(i) to "Section 4044" should be read as incorporating all of § 4044 including § 4044(d)(2). Treas.Reg. § 1.414(1)–1(b)(5)(i) refers to "the benefits that would be provided exclusively by the *plan assets* pursuant to section 4044 of . . . ['ERISA'] . . . if the plan terminated." (Emphasis added). Plaintiffs' interpretation of Treas.Reg. § 1.414(1)–1(b)(5)(i) causes it to be in direct conflict with Treas.Reg. § 1.414(1)–1(e)(1) which is quoted above. The two provisions can be reconciled rationally if Treas.Reg. § 1.414(1)–1(b)(5)(i) is read to refer to "accrued" benefits as provided by sections 4044(a) and (b) if the plan terminated, and to exclude any hypothetical

entitlement to a portion of any surplus. The next section of the regulation, Treas. Reg. § 1.414(1)–1(b)(5)(ii) refers to "the allocation of assets to various priority categories under section 4044." Only sections 4044(a) and (b) contain priority categories which were developed to allocate assets available to provide for accrued benefits when there are insufficient assets to provide for all accrued benefits. If Treas.Reg. § 1.414(1)–1(b)(5)(i) is read to include section 4044(d)(2), then Treas.Reg. § 1.414(1)–1(e)(1) is rendered directly inconsistent because it provides that one look only to *accrued* benefits. Regulations within the same scheme should, where feasible, be read as consistent with each other. *See Zambardino v. Schweiker*, 668 F.2d 194, 200 (3d Cir.1981). In this context, where Treasury Regulations must be construed, the determination by the Internal Revenue Service that the 1979 reactivation of TARP does not violate Section 401(a) of the Internal Revenue Code assumes some significance.

Plaintiffs advance a detailed argument for the proposition that the proper portion of the Regulations to be applied is not § 1.414(1)–1(e)(1) (which governs merger of defined benefit plans); rather, the applicable Regulation is § 1.414(1)–1(b)(3) (which defines a transfer of assets or liabilities) and § 1.414(1)–1(n) and (*o*).

Subsection 1(b)(3) provides:

A "transfer of assets or liabilities" occurs when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan. For example, the shifting of . . . liabilities pursuant to a reciprocity agreement between two plans in which one plan assumes liabilities of another plan is a transfer of assets or liabilities. * * *

---

4. Plaintiffs urge that the definition of "accrued benefit" which appears in 26 U.S.C. § 411(a)(7) (a section of the statute relating to Minimum Vesting Standards) cannot properly be applied to § 414(*l*) which deals with mergers and consolidations of plans or transfers of plan assets. I do not think the definition need be so limited.

Section 414(*l*) applies "only to plans to which section 411 applies . . .," Treas.Reg. § 1.414(1)–1(a)(1), and the term "accrued benefit" although used in the regulations under § 414(*l*), is not defined in those regulations or in the section of the statute they implement.

Plaintiffs contend that TARP's obligation to pick up liabilities which accrue in the future on account of the 400 employees transferred to it constitutes a transfer of liabilities to it from FARP.

Plaintiffs then turn to Subsection 1(o) of the Regulations which provides:

(o) *Transfers of assets and liabilities.* Any transfer of assets or liabilities will for purposes of section 414(1) be considered as a *combination of separate mergers and spinoffs* using the rules of paragraphs (d), (e) through (j), (*l*), (m) or (n) of this section, *whichever is appropriate.* Thus for example, if in accordance with the *transfer of one or more employees,* a block of assets and liabilities are transferred from Plan A to Plan B ... the transaction will be considered as a spinoff from Plan A and a merger of one of the spunoff plans with Plan B. The spinoff and merger described ... would be subject to the requirements of paragraphs (n) and (e) through (j) of this section, *respectively.*

(Emphasis supplied).

Applying this subsection, plaintiffs argue that "[t]he steps that effected reactivation constitute a combination of (a) the spinoff from FARP of coverage after January 1, 1979, for all people who had been participants in TARP (including benefits based on credited service for the 15 years they had been in FARP), and (b) the merger of that bundle of roughly 400 participants, naked liabilities, and no assets with 'old' TARP, which is a bundle of assets grotesquely exceeding defined benefit liabilities for roughly 1700 participants (1300 already retired)." (Plaintiffs' Reply Brief at p. 64).

Subsection 1(n) provides:

(n) *Spinoff of a defined benefit plan* —(1) *General Rule.* In the case of a spinoff of a defined benefit plan, the requirements of section 414(1) will be satisfied if—

(i) All of the accrued benefits of each participant are allocated to only one of the spun off plans, and

(ii) The value of the *assets allocated* to *each* of the spunoff plans is not less

than the sum of the present value of the benefits on a termination basis in the plan before the spinoff for all participants in that spunoff plan.

(2) *De minimis rule.* In the case of a spinoff, the requirements of section 414(1) will be deemed to be satisfied if the *value of the assets spunoff*—

(i) equals the present value of all accrued benefits spun off (whether or not vested), *and*

(ii) * * * is *not less than 3 percent of the assets* as of at least one day in [the plan] year [in which the spinoff occurs].

(Emphasis supplied).

Plaintiffs contend that the "spinoff" of employees from FARP to TARP did not meet the subsection 1(n) requirements in several respects: (i) It fails the (n)(1)(ii) test because the assets transferred from TARP to FARP (none) will not have a value of "not less than the sum of the present value of the benefits on a termination basis before the spinoff for [the 400] participants in that spinoff plan." (ii) It fails the (n)(2)(ii) test because no assets from FARP were spun off and the spun off plan (FARP's liabilities with respect to the 400 participants on and after January 1, 1979) did not carry with it "not less than 3 percent of the [FARP] assets" as of any one day in the FARP plan year.

Plaintiffs also contend that the reactivation fails the merger requirements of the Regulations. In essence they suggest that application of Treas.Reg. 1.414(1)–1(e) exclusively is erroneous, because that Regulation applies to defined benefit plans whereas in fact TARP is also a defined contribution plan, a status it acquired "when it went into surplus." At that point, according to plaintiffs, any merger became subject to the requirements of Treas.Reg. 1.414(1)–1(1), which mandates application of either paragraph (d) or paragraphs (e) through (j). Without setting forth each step of plaintiffs' analysis, it may be said that they concluded that the TARP reactivation did not meet the requirements of these paragraphs.

■ Two fallacies appear in plaintiffs' argument. First, I do not believe that the right of a participant under Section 4044(d)(2) of ERISA to receive a portion of any surplus remaining upon termination creates account balances for plaintiffs which convert what was originally a defined benefit plan into a defined contribution plan so as to trigger the provisions of Treas.Reg. 1.414(1)–1(1). Were this held to be the case, any defined benefit pension plan would become a defined contribution plan when a surplus developed which, under the provisions of Section 4044(d)(2), would be distributable to participants on termination. Second, plaintiffs' entire analysis rests upon the proposition that FARP's relief from potential but as yet unincurred liabilities and TARP's obligation to pick up responsibilities for benefits which will arise in the future is a "transfer of liabilities." As I have noted above, I do not believe this is the case. The reactivation of TARP and the return to it of 400 employees formerly covered by that plan is not a transfer of liabilities to TARP within the meaning of Section 208 of ERISA, 29 U.S.C. § 1058, and Treas.Reg. 1.414(1). Therefore the Regulation is simply not applicable.

Having concluded that reactivation of TARP does not violate defendants' fiduciary duties under ERISA and is not a violation of Section 208 of ERISA, it follows that plaintiffs' motion for summary judgment on the Second Count of defendants' counterclaim must be denied and that plaintiffs are not entitled to the order they seek as to the use of FARP surplus. It also follows that defendants' motion for summary judgment in its favor on that Count should be granted.[5]

C. *Termination of TARP:* Plaintiffs seek an order declaring that TARP is to be terminated on a date certain. In support of this application plaintiffs point to common law trust rules requiring the termination of trusts when all of the beneficiaries demand it (unless continuation of the trust is necessary to carry out a material purpose of the trust). *Restatement of Trusts* 2d, §§ 337, 340; *Scott on Trusts*, Sec. 337; *Fidelity Union Trust Co. v. Birch*, 121 N.J.Eq. 132, 186 A. 816 (Ch.1936).

However, there are substantial differences between trusts established by individuals, either inter vivos or by will, and pension plans created by employers for their employees and governed in meticulous detail by ERISA. In the latter situation there are some decisions which remain in the control of the employers in the exercise of their business judgment. One of those decisions is whether to terminate or continue a plan.

■ As set forth above, I have concluded that defendants did not violate any fiduciary duty to TARP's participants when it reactivated TARP and brought 400 employees back into it after their sojourn in FARP. The decision not to terminate is simply the other side of the same coin. If it is lawful to reactivate TARP, it is necessarily lawful not to terminate TARP. Plaintiffs are not entitled to a judgment requiring that TARP be terminated.

### III. *Other Motions*

A. *Defendants' Motion for Reconsideration:* In his October 27, 1980 opinion Judge Meanor ruled upon plaintiffs' contentions that specified items should have been paid to TARP or should not have been charged to TARP. Defendants seek reconsideration of certain of these determinations, namely: (i) that Prudential Insurance Company dividends and termination credits were payable to TARP and that to the extent that they were not deposited in TARP, they must be restored with interest; (ii) that in light of the particular provisions of the John Hancock Insurance Company policy, there is a question of fact whether Section 1.5 of TARP requires that the payments thereunder should have been or should be in the future deposited in TARP;

---

5. In view of this determination it is unnecessary to consider whether, in lieu of reactivation, a merger of TARP and FARP would be lawful.

(iii) that dividends, termination credits and experience rating refunds derived from the writing by defendant FFALIC of TARP annuities which have been diverted by TARP to FARP, if any, must be restored to TARP with interest; and (iv) that charges by FFALIC against TARP funds for administrative expenses during the period that FFALIC held the TARP funds and wrote annuities should be restored to TARP with interest.

Defendants' motion for reconsideration covers substantially the same ground as its January 27, 1981 motion for reconsideration. This motion was denied by an order filed August 25, 1981. Thus defendants have had two opportunities to argue these issues. I do not think it appropriate to give them a third. Judge Meanor's rulings on these questions will be deemed to be law of the case. Defendants' pending motion for reconsideration and modification of portions of the October 23, 1980 opinion and August 25, 1981 order will be denied.

B. *Motions Directed to Paragraph 21 of the August 25, 1981 Order:* Paragraph 21 of the August 25, 1981 order provides:

> that defendants be and hereby are ordered to exercise their fiduciary discretion within thirty (30) days from the entry of this order and decide whether, by amendment or otherwise, an increase in TARP benefits is appropriate.

Defendants appealed this paragraph to the Third Circuit Court of Appeals and obtained a stay pending resolution of the appeal. The Court of Appeals, as noted above, dismissed the appeal for want of appellate jurisdiction. Defendants have not complied with the mandate of the paragraph.

Plaintiffs moved for an order compelling compliance. Defendants moved to vacate the order.

Judge Meanor's opinion stated that there was no evidence that defendants had, in the exercise of their fiduciary responsibility, considered and rejected the possibility of increasing benefits in a manner that would dissipate surplus. He ordered such consideration and directed that:

The decision should be based in part upon (1) the fact that between one-third and one-half of the funds in TARP are attributable to employer [sic] contributions, (2) the fact that I have held that surplus funds so attributable must be distributed to the employees under § 4044(d)(2) of ERISA, (3) that I have held that use of "employee surplus" to fund FARP benefits or newly-accrued benefits in a reactivated TARP is impermissible on unjust enrichment grounds and a violation of the "exclusive benefit" rule, and (4) defendants' knowledge, at least since 1964, of the existence of the surplus.

Slip Op. at 75.

Judge Meanor's requirement seems to have been based in part, at least, on his application of the unjust enrichment principles and the concept that plaintiffs have a pretermination right to accrued surplus. Both of these propositions were rejected by the Court of Appeals. Further, I have concluded, as set forth in Part II A of this opinion, that certain employer decisions such as creation, suspension and termination of funds are matters within the area of business judgment and are not governed by strict fiduciary principles. The decision whether to increase benefits is within the same category of decisions. I think it is inconsistent with this reasoning and legal error to require defendants to exercise a "fiduciary responsibility" to decide whether to increase benefits.

As a business decision defendants may decide to increase benefits or they may decide to maintain existing benefits. If their decision results in the perpetuation of a TARP surplus, that surplus will be disposed of in accordance with the mandates of ERISA and the TARP documents when TARP finally terminates.

I shall not treat Judge Meanor's decision in this regard as the law of the case because I believe that the opinion of the Court of Appeals undermines its legal basis.

Therefore plaintiffs' motion to compel compliance with paragraph 21 will be denied and defendants' motion to vacate paragraph 21 of the August 25 order will be granted.

C. *Miscellaneous Motions:* Defendants moved for sanctions against plaintiffs by reason of plaintiffs' filing their motion for summary judgment. The questions raised by the cross-motions for summary judgment were difficult ones and plaintiffs' motion was not frivolous. The motion for sanctions will be denied.

There are also pending defendants' motion for discovery on termination, plaintiffs' motion to compel production of privileged documents, plaintiffs' motion for an order on mandate and plaintiffs' motion on costs of class notice. These motions may either be rendered moot by the determinations set forth in this opinion or they may otherwise be affected by the determinations. Consequently decisions on these motions will be held in abeyance until I have had an opportunity to confer with counsel. At that time I would expect to establish the manner in which this case in its entirety can be brought to a prompt conclusion. The status of unresolved motions will be determined in that context.

Defendants' attorneys are requested to submit a form of order embodying the rulings set forth above.